In the

# United States Court of Appeals

### For the Seventh Circuit

No. 08-2173

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

MICHAEL J. and CYNTHIA T. FLETCHER,

*Defendants-Appellants.*

Appeal from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 06 C 6056—**Ronald A. Guzmán**, *Judge*.

ARGUED OCTOBER 30, 2008—DECIDED APRIL 10, 2009

Before EASTERBROOK, *Chief Judge*, and RIPPLE and TINDER, *Circuit Judges*.

EASTERBROOK, *Chief Judge*. Ernst & Young spun off its information-technology consulting group in 2000. Cap Gemini, S.A., a French corporation, bought this business and became Cap Gemini Ernst & Young, a multinational firm. Today it is known as Capgemini, and we use that name for the firm after the 2000 acquisition.

Consulting partners of Ernst & Young received shares in Capgemini in exchange for their partnership interests in Ernst & Young. This was not a like-kind exchange, so it was a taxable event for the partners. Because Ernst & Young and its partners expected shares in the new business to appreciate, they wanted all of the income to be recognized in 2000. That way any appreciation would be taxed as a capital gain. But Cap Gemini wanted to ensure the partners' loyalty to the new business; a consulting group depends on its staff, and if they left after taking the stock the business might be crippled. Transferring the shares in installments might address these subjects but also would make the transfers look like ordinary income—and, if the shares appreciated in the meantime, the partners would receive fewer. Ernst & Young and Cap Gemini decided that a transfer of all of the shares in 2000, subject to what amounted to an escrow, would preserve the tax benefits while serving business objectives. So the shares received in the transaction were restricted for almost five years: if a partner quit, was fired for cause, or went into competition with the new business, some or all of the shares could be forfeited.

Ernst & Young, Cap Gemini, and the partners agreed by contract that they would report the transaction as a partnership-for-shares swap in 2000, fully taxable in that year. The agreed-on characterization allowed Capgemini to take depreciation deductions, see 26 U.S.C. §197, starting in 2000, and ensured consistent tax treatment of all parties. The Commissioner of Internal Revenue might have challenged the parties' characterization, see 26 U.S.C. §269, but decided to accept it. Approximately

25% of the shares were sold in 2000 to generate cash that the partners used to pay their taxes; the remainder of the shares were held by Merrill Lynch subject to instructions from Capgemini until restrictions lapsed. Each ex-partner had a separate account for this purpose.

Cynthia Fletcher, one of Ernst & Young's consulting partners, voted for the transaction, signed the contract, moved to Capgemini, and received 16,500 shares in that business as payment for her partnership interest. The market value of these shares on the day the sale closed was about $2.5 million. Only 12,375 shares were deposited in the restricted account; the rest were sold for $653,756, which was distributed to Fletcher to cover taxes. In February 2001 Capgemini sent Fletcher a Form 1099-B reflecting that she had received $2,478,655 in stock, taxable at ordinary-income rates (save for some $91,000 attributable to §751 property), from the sale of her partnership interest. She and her husband Michael (they filed a joint return) reported this income as received in 2000, just as her contract with Capgemini required. The couple's gross income for 2000 was reported as $3,733,180, on which they paid $972,121 in income tax.

Had the market price of stock in Capgemini risen, as the parties anticipated, that would have been a good outcome for Fletcher and the other ex-partners. But although Capgemini traded above €300 a share early in 2001, by 2003 it was below €50, where it has remained. (So far in 2009 it has traded for about €25.) This made the deal look bad in retrospect; the partners would have been better off had distribution of the stock been deferred.

Fletcher quit in 2003. Although she left before the five years required by the contract, Capgemini waived its rights and directed Merrill Lynch to lift all restrictions on the stock in her account. Fletcher then filed an amended tax return for 2000. She now took the position that only the $653,756 distributed from the account was income in 2000. On her new view of matters, the rest of the income was not received until 2003, and the amount was much reduced in light of the lower market price of Capgemini shares in 2003. Apparently without checking how other taxpayers affected by the 2000 transaction had been treated, the Internal Revenue Service paid Fletcher a refund of about $387,000 plus interest. Contending that this refund had been mistaken, the United States filed this suit to get the money back. Similar litigation is pending in many other district courts—some suits by the United States, some by ex-partners who want refunds.

The IRS's principal argument is that Fletcher and the other ex-partners are bound by their own characterization of the transaction as one in which all shares were received in 2000. Having adopted this characterization with the goal of minimizing taxes, they must adhere to it even though market movements have made it disadvantageous, the United States insists. It relies principally on *CIR v. Danielson*, 378 F.2d 771 (3d Cir. 1967), which held just this, and on a *Danielson*-like remark in *Comdisco, Inc. v. United States*, 756 F.2d 569, 577 (7th Cir. 1985): "[A] taxpayer generally may not disavow the form of a deal." Some courts have allowed taxpayers to disregard their own forms when "strong proof" shows that

the economic reality was something else. See, e.g., *Leslie S. Ray Insurance Agency, Inc. v. United States*, 463 F.2d 210, 212 (1st Cir. 1972); *Ullman v. CIR*, 264 F.2d 305, 308 (2d Cir. 1959). We used the "strong proof" formulation in *Kreider v. CIR*, 762 F.2d 580, 586–87 (7th Cir. 1985), though without mentioning either *Comdisco* or *Danielson*. The district court concluded that it was unnecessary to choose between these approaches (or their variants), because on any standard the parties set out to ensure that all income was recognized in 2000—and although the Commissioner has some power to recharacterize transactions so that they match economic substance, taxpayers can't look through the forms they chose themselves in order to improve their tax treatment with the benefit of hindsight. See *Gregory v. Helvering*, 293 U.S. 465 (1935). See also Joseph Bankman, *The Economic Substance Doctrine*, 74 S. Cal. L. Rev. 5 (2000); Saul Levmore, *Recharacterizations and the Nature of Theory in Corporate Tax Law*, 136 U. Pa. L. Rev. 1019 (1988); David A. Weisbach, *Formalism in the Tax Law*, 66 U. Chi. L. Rev. 860 (1999). So the district court entered summary judgment for the United States and ordered Fletcher to repay the refund. 2008 U.S. Dist. LEXIS 3555 (N.D. Ill. Jan. 15, 2008).

Fletcher argues that she didn't "really" agree to the structure that Ernst & Young and Cap Gemini (and most of her partners) wanted in 2000. If she had voted no and refused to sign, she maintains, she would have been excluded from the economic benefits and might have been fired. If this is so, then she had a difficult choice to make; it does not relieve her of the choice's consequences. Hard choices may be gut-wrenching, but they are choices

nonetheless. Even naïve people baffled by the fine print in contracts are held to their terms; a sophisticated business consultant who agrees to a multi-million-dollar transaction is not entitled to demand the deal's benefits while avoiding its detriments. The argument that Fletcher can avoid the terms as a matter of contract law is frivolous. All that matters now are the tax consequences of the contracts she signed.

That a transaction's form determines taxation is (or at least should be) common ground among the parties. If private parties structure their transaction as a sale of assets, they can't later treat it for tax purposes as if it had been a merger. *CIR v. National Alfalfa Dehydrating & Milling Co.*, 417 U.S. 134 (1974). Cf. *Landreth Timber Co. v. Landreth*, 471 U.S. 681 (1985) (same principle in securities law). Parties who structure their transaction as a sale and leaseback can't treat it as a mortgage loan for tax purposes—though the Commissioner may be able to recharacterize it so that the tax treatment matches its economic substance. See *Frank Lyon Co. v. United States*, 435 U.S. 561 (1978). If Cap Gemini transfers stock in 2000, cash-basis taxpayers such as Fletcher can't treat the income as received in 2001 or 2003, even though it would have been child's play to do the deal so that the income was received in those years.

The United States treats Fletcher as if she were trying to report an asset sale as a merger, or income received in 2000 as if it had been received in 2003. This is not, however, the sort of argument that Fletcher advances. She does not want to proceed as if the deal had different

terms. She argues instead that the deal's *actual* terms have tax consequences different from those that her contracts with Ernst & Young and Cap Gemini required her to report in 2000. An example makes this clear. Suppose that Cap Gemini had deposited stock in the Merrill Lynch accounts in annual installments from 2000 through 2004, and that the parties had agreed to report that all income from the partnership-for-stock sale had been received in 2000 because the closing occurred that year. That agreement would not affect taxation. Private parties can contract about when income is received, to be sure, but the tax rules about realization and recognition are extrinsic. People determine what transactions to engage in; federal law then specifies how much tax is due. Because Fletcher does not try to recharacterize the transaction, doctrines that limit or foreclose taxpayers' ability to take such a step are beside the point.

What, then, are the tax consequences of the parties' chosen form? Cap Gemini deposited all of the shares into individual accounts in 2000; from its perspective, the consideration had been paid in full. But the accounts were restricted. Ex-partners received 25% in cash that year, while the rest of the stock could be reached only as time passed. From the moment of the deposit in 2000, however, the ex-partners bore the economic risk: If the stock rose in the market, the ex-partners stood to reap the whole gain, and if the stock fell the ex-partners would bear the whole loss. This makes them the beneficial owners as of 2000, the IRS contends. For her part, Fletcher stresses the restrictions and maintains that until she could do with the stock as she pleased—in other words sell it, not just

watch nervously as it rose or fell—it did not count as income.

The Commissioner has the better of this argument, as can be seen by considering the tax consequences of depositing cash into a blocked account. Suppose that an inventor sells his patent in 2000 for $2.5 million, all paid immediately—but by contract the inventor agrees that $2 million will be put into a trust that will not be distributed until 2005. From the buyer's perspective, the full consideration is paid in 2000. And from the inventor's, the full consideration is received in 2000. The inventor agrees to defer consumption for five years, perhaps as a spendthrift precaution, but a taxpayer's willingness to defer consumption does not defer taxation—for the tax falls on income rather than consumption. See 26 U.S.C. §451(a) (any item of gross income is taxed in the year received). Income is "received" not only when paid in hand but also when the economic value is within the taxpayer's control; this is known as constructive receipt. 26 C.F.R. §1.451–2. It is why a person who earns income can't avoid tax by telling his employer to send a paycheck to his college, or his son, rather than to his bank. Authority to direct the disposition of income is constructive receipt. In our example, the inventor could have chosen to receive the $2.5 million in cash. Agreement with the buyer that $2 million would be sent to a trustee and held for five years does not avoid the fact that the inventor had the power to direct what became of the money; that's what the contract was about. And much the same can be said for Fletcher: She agreed by contract that 75% of the consideration would be held in

a restricted account for up to five years, but her willing-ness to accept restrictions and defer consumption does not eliminate constructive receipt in 2000.

Imagine that, instead of providing for payment in stock, the contract among Ernst & Young, Cap Gemini, and the partners had called for some cash in 2000 plus a zero-coupon bond, handed over to the ex-partner in 2000 and maturing in 2005. That bond is income in 2000, even to a cash-basis taxpayer, because it is property that can be sold in the market. Suppose that the partners also made side agreements with Capgemini not to sell their bonds for five years. (Equivalently, the ex-partners might have accepted unregistered securities, with a side agreement that Capgemini would register them and thus facilitate sale in 2005 if the ex-partner were still employed.) An agreement not to sell would not change the nature of the bonds as property, and thus income, received in 2000. See *Racine v. CIR*, 493 F.3d 777 (7th Cir. 2007) (a transaction involving stock options, but that's not a material differ-ence). But deferral of the right to sell would reduce the value of the bonds, and hence the amount of income, because an illiquid asset is worth less than a liquid one. Whether the security is handed over to the ex-partner with a legend reflecting the limits on sale, or instead is handed to an intermediary such as Merrill Lynch with instructions to enforce contractual restrictions on the sale of an un-legended security, should not matter for tax purposes. The actual structure of the 2000 transaction is much like our hypothetical zero-coupon bond, though because the restrictions on sale were lifted year by year

it is more like one bond maturing in one year, another bond maturing in two years, and so on through five years.

Three aspects of the contracts that Fletcher signed are important to this understanding. First, it matters that Fletcher and the other ex-partners stood to receive the entire market gain, and to bear all loss, from the moment the transaction closed in 2000. That feature of the deal shows that the stock was in her constructive possession in 2000. Second, it matters that Fletcher agreed to postpone her unrestricted access to the stock. This is why the deal looks like our inventor hypothetical. Third, it matters that Fletcher agreed to the amount of the discount. The contracts among Ernst & Young, Cap Gemini, and the partners specified that the restrictions would be treated as reducing the value of the stock to 95% of its market price on the closing date. (This reflects not only illiquidity but also the risk that Capgemini would use its power over the account in an unauthorized way, or that Merrill Lynch might fail in its duty as a custodian.) An ex-partner would be hard pressed in light of this agreement to argue that the discount should be 10% or 20%; Fletcher does not try. She insists instead that *nothing* counts as income in 2000 other than what was actually put in her hands in cash. And that position is incompatible with the examples we have given.

One more complication. The consulting partners agreed to give back some of the stock if they quit early and went into competition with Capgemini. If the parties' goal of encouraging the ex-partners to remain with Capgemini had been accomplished by giving the partners immedi-

ate access to the stock but requiring them to grant Capgemini a security interest in their homes, so that repayment would be assured, then all of the income would be treated as received in 2000. If instead Capgemini had doled out the stock in installments (say, 50% in 2000 and 50% if the ex-partner remained on its payroll in 2005), then only 50% would be taxable in 2000. The actual transaction was somewhere in between: 100% of the stock was transferred to Merrill Lynch in 2000 and the custodian was to hold it until conditions (such as not competing) had been satisfied. For reasons we have covered—principally the fact that the ex-partners received the entire economic gain and loss from changes in the price of the securities from 2000 forward—the transaction looks more like income in 2000 than like a stream of payments over time. Several courts have held that, where stock is transferred under a sales agreement and held in escrow to guarantee a party's performance under the agreement, the party "receives" the stock when it is placed in escrow rather than when it is released. See *Chaplin v. CIR*, 136 F.2d 298, 299–302 (9th Cir. 1943); *Bonham v. CIR*, 89 F.2d 725, 726–28 (8th Cir. 1937); see also *Whitney Corp. v. CIR*, 105 F.2d 438, 441 (8th Cir. 1939). That principle applies here.

The more likely it is that the conditions will be satisfied, and all restrictions lifted, the more sensible it is to treat all of the stock as constructively received when deposited in the account. To see this, suppose that the parties had wanted to defer the recognition of income and had put $2.5 million in each partner's account, with the condition that the whole amount would be forfeited

if the temperature in Barrow, Alaska, exceeded 80° F on January 1, 2005. Would the remote possibility of an Arctic heat wave enable the partners to defer paying taxes? Surely not. See *Cemco Investors, LLC v. United States*, 515 F.3d 749 (7th Cir. 2008). If, on the other hand, the parties agreed that the ex-partners would receive $2.5 million only if the temperature in Barrow on January 1, 2005, exceeded 80° F, then none of the partners would constructively receive income in 2000; everything would depend on events in 2005.

The sort of contingencies that could lead to forfeitures were within the ex-partners' control. That implies taxability in 2000, for control is a form of constructive possession. And the agreement to discount the stock by only 5% tells us that the parties deemed forfeitures unlikely. Fletcher's acknowledgment that the risk of forfeiture was small shows that the conditions of constructive receipt in 2000 have been satisfied.

Thus although we agree with Fletcher that the ex-partners are entitled to contest the tax treatment called for by the 2000 contracts, we hold that the shares are taxable in 2000 at their value on the date of deposit to the accounts at Merrill Lynch. Income was constructively received in that year not because the contract said that everyone would report it so to the IRS, but because the parties were *right* to think that this transaction's actual provisions made the income attributable to 2000. That the price of Capgemini stock dropped in 2001 and later does not entitle the parties to defer the recognition of income. Fletcher must repay the refund (and amend her

returns for later years to reflect receipt of the income in 2000).

AFFIRMED