**UNITED STATES of America,
Plaintiff,**

v.

**John G. NACKEL and Gail
H. Nackel, Defendants.**

**Case No. CV–05–6680–SGL (CWx).**

United States District Court,
C.D. California.

Oct. 20, 2009.

Andrew Pribe, Evan J. Davis, Gregory A. Roth, AUSA–Office of U.S. Attorney, Los Angeles, CA, for Plaintiff.

Elliott H. Kajan, Lydia Bottome Turanchik, Kajan Mather and Barish, Beverly Hills, CA, for Defendants.

## ORDER GRANTING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT

STEPHEN G. LARSON, District Judge.

This case is one of many being litigated nationwide concerning the tax treatment of restricted stock that was provided to former Ernst & Young consulting partners as part of the sale of their consulting practice to a large, publicly-traded French company, Cap Gemini, S.A., in 2000. *See United States v. Fletcher,* 2008 WL 162758 (N.D.Ill. Jan. 15, 2008), *aff'd* 562 F.3d 839 (7th Cir.2009); *United States v. Bergbauer,* 2008 WL 3906784 (D.Md. Aug. 18, 2008); *United States v. Berry,* 2008 WL 4526178 (D.N.H. Oct. 2, 2008). In each of those cases, as in this one, the former Ernst & Young consulting partner filed an original income tax return declaring the value of the restricted stock (minus a five percent discount) as present income subject to immediate taxation. Years later, however, those same partners filed amended tax returns for the 2000 tax year that sought to modify the tax treatment of the restricted stock so that its value was not included as present income for that year, thereby seeking and receiving a tax refund for the 2000 tax year from the government on that basis. In those cases, as in this one, the United States subsequently brought an action pursuant to 26 U.S.C. § 7405 seeking to recover the tax refund given to the former Ernst & Young partner—here John Nackel—for the 2000 tax year on the ground that the refund was issued in error.[1]

The United States has brought a motion for summary judgment on its claim, Nackel has filed an opposition, and the United States has filed a reply thereto. For the reasons set forth below, the Court **GRANTS** the government's motion for summary judgment.

### I. UNDISPUTED FACTS

A. *Nackel's Employment at Ernst & Young*

Upon completing his PhD in industrial engineering and healthcare systems design

---

**1.** Defendant Gail Nackel is only named as a party to this case because the Nackels jointly filed their 2000 tax return (original and amended). Given that Gail Nackel is only a nominal party to this action, the Court will confine its discussion to defendant John Nackel.

in 1977, John Nackel joined Ernst & Young's healthcare consulting division at its Chicago office. After having been promoted several times while serving in the Chicago office, Nackel was later transferred to Ernst & Young's national office in Cleveland, Ohio.

On October 1, 1983, Nackel became a partner at Ernst & Young. At the time he became a partner, Nackel was the national director of healthcare consulting, a staff position. Nackel subsequently became a regional manager of that department where he managed about 200 people. From 1993 to 1999, Nackel ran the Ernst & Young global healthcare consulting practice, one of the largest and most profitable business units at Ernst & Young. In this role, Nackel reported directly to the CEO of the Ernst & Young consulting practice who, in turn, reported directly to the chairman of Ernst & Young.

Thereafter Nackel went to Ernst & Young's venture-capital group where he led a team of about 20 very high-level Ernst & Young partners and senior managers, who were responsible for investing Ernst & Young's funds with the firm's strategic clients and reviewing agreements that gave Ernst & Young an equity stake in a client.

As one would expect, in his various positions at Ernst & Young Nackel reviewed sophisticated contracts including those with a very sizeable monetary value.

By 2000 Nackel was only 18 months away from being able to retire from Ernst & Young with a full pension, entitling him to somewhere between $600,000 to $800,000 in retirement funds annually. In the three tax years preceding the 2000 tax year, Nackel earned approximately $1,650,000 in 1999, $1,700,000 in 1998, and $1,200,000 in 1997.

## B. *Ernst & Young Contemplates Sale of its Consulting Practice*

Up until early 2000, the U.S. practice at Ernst & Young was divided into three principal practice groups: Auditing, tax, and consulting. In 1999, Ernst & Young began exploring ways in which it could spin-off its consulting practice group once indications surfaced that the Securities and Exchange Commission would require accounting firms like Ernst & Young to divest themselves of their consulting practice to avoid ethical questions of undue influence with clients also utilizing the firm's tax and/or accounting services.

Later that year, Ernst & Young and Cap Gemini, S.A., agreed to the broad outlines of a deal in which Cap Gemini, S.A., would purchase Ernst & Young's consulting practice. As some courts have characterized the broad outlines of the contemplated transaction: "Ernst & Young [would] contribute [ ] its consulting business to a newly-formed ... company called Cap Gemini Ernst & Young" (hereinafter "CGEY") and in return Cap Gemini, S.A., would provide shares of its stock as well as payment in euros. *Fletcher*, 2008 WL 162758 at *1.

Broadly speaking, under the transaction, Cap Gemini, S.A., would purchase Ernst & Young's consulting business in exchange for nearly 31 million shares of Cap Gemini, S.A., stock, to be newly issued, and Q375 million.[2] Through the transaction, Cap Gemini, S.A., would increase its capitalization by at least 39%. Under the agreement, Ernst & Young, as a firm, would receive the euros, and the Cap Gemini, S.A., stock would be split between Ernst & Young as a firm, the consulting partners individually, and the non-consulting partners (*i.e.*, the Ernst & Young audit and tax

---

**2.** Before the transaction, Cap Gemini, S.A., had 78 million shares outstanding.

partners) individually. As part of the transaction, the Ernst & Young consulting partners would become employees of CGEY and were completely divested of their Ernst & Young partnership interest. *See Fletcher,* 2008 WL 162758 at *1 ("the consulting partners would become employees of Cap [Gemini by way of this newly formed company] and would be given shares of stock in Cap [Gemini] in exchange for their interest in Ernst & Young"); *Fletcher,* 562 F.3d at 840 ("Consulting partners of Ernst & Young received shares in Cap [Gemini Ernst & Young] in exchange for their partnership interests in Ernst & Young"); *Berry,* 2008 WL 4526178, at *1 ("As part of the transaction, the [consulting partner's] would become employees of Cap and would be given shares of stock in Cap in exchange for their interest in Ernst & Young"); *Bergbauer,* 2008 WL 3906784, at *1 ("Under the terms of the transaction, Cap Gemini purchased Ernst & Young's consulting business by issuing shares of its stock, subject to certain restrictions, to Ernst & Young's ... consulting partners"). Under the transaction, consulting partners were allocated Cap Gemini stock between four-to-six times their fiscal-year 1999 accrual earnings at Ernst & Young; non-consulting partners were allocated Cap Gemini stock equal to twice their fiscal year 1999 earnings at Ernst & Young.

The manner and form of the Cap Gemini, S.A., shares of stock the consulting partners would receive in return for their interests in the Ernst & Young consulting practice were similarly described by some courts as follows: "[T]wenty-five percent of the shares received by a consulting partner would be immediately sold to provide funds for the payment of income taxes incurred as a result of the stock transaction. The remaining seventy-five percent of a consulting partner's shares would be placed in an account with Merrill Lynch"

with said shares being subject to a host of restrictions (detailed below) on the consulting partner's ability to sell, assign, *etc.,* them that would gradually be lifted in installments over a five-year period. *Berry,* 2008 WL 4526178, at *1. Moreover, said restricted stock was subject to forfeiture should the consulting partner voluntarily quit his or her job, was fired for cause, or went into competition with the new business. *Fletcher,* 562 F.3d at 840 ("if a partner quit, was fired for cause, or went into competition with the new business, some or all of the shares could be forfeited").

The reason for the placement of the forfeiture provisions as well as restrictions on the alienability of the stock and then staggering the lifting of those restrictions over a five-year period was ably explained by the Seventh Circuit's decision in *Fletcher*:

> Because Ernst & Young and its partners expected shares in the new business to appreciate, they wanted all of the income to be recognized in 2000. That way any appreciation would be taxed [in the out years] as a capital gain [, which would be at a much lower tax rate than if it were reported as personal income]. But Cap Gemini wanted to ensure the partner's loyalty to the new business; a consulting group depends on its staff, and if they left after [cashing out and] taking the stock the business might be crippled. Transferring the shares in installments might address these subjects but would also make [each installment of] the transfers look like [separate] ordinary income—and, if the shares appreciated in the meantime, the partners would receive fewer. Ernst & Young and Cap Gemini decided that a transfer of all of the shares in 2000, subject to what amounted to an escrow, would preserve the tax benefits while serving

business objectives. So the shares received in the transaction were restricted for almost five years: if a partner quit, was fired for cause, or went into competition with a new business, some or all of the shares could be forfeited.

562 F.3d at 840.

The Ernst & Young team that negotiated the deal with Cap Gemini, S.A., included the following members of Ernst & Young's consulting practice group—Roger Nelson, the chair of the consulting practice; Terry Ozan and Dale Wartluft, vice chairs of the consulting practice; Norm Pasas, chief financial officer of the consulting practice; and Mark Houser, a consulting partner. Nackel did not request to be on the negotiating team. It was later admitted that there were not significant negotiations by the parties regarding valuation issues on the shares of Cap Gemini, S.A., stock (restricted or otherwise) transferred to consulting partners because other issues were deemed to be more important by those involved.

All Ernst & Young partners were advised of the possibility of a transaction with Cap Gemini, S.A., at the beginning of December, 1999. Nackel, however, had earlier notice of this transaction due to his membership on a special committee at Ernst & Young, the America's Executive Committee, which became involved in reviewing the transaction by late October or early November, 1999. Moreover, as a member of that committee, Nackel was privy to information regarding the substance of the Ernst & Young–Cap Gemini, S.A., negotiations long before other Ernst & Young partners. Indeed, sometimes as a result of feedback from the America's Executive Committee, the Ernst & Young negotiators would make substantive changes in the terms of the transaction, but again no substantive discussions over

valuation of the distributed Cap Gemini shares was undertaken.

On February 28, 2000, Ernst & Young and Cap Gemini, S.A. executed a 198–page Master Agreement that outlined the particulars of the entire transaction.

Shortly thereafter, on or about March 1, 2000, Ernst & Young distributed a 82–page Partner Information Document ("PID") with attachments to its partners, including Nackel, that set forth many details and offered a comprehensive explanation of the above-transaction.

Under the heading "Overview of the Transaction," the PID stated that the sale of the consulting practice to Cap Gemini, S.A., "should be a capital gain transaction, taxable at capital gain rates, with a minimal amount of ordinary income," implying that the shares given to partners was to be treated as having been presently received. Under the heading "Tax Implications," the PID explained that the transaction would constitute a capital gain reportable on the partner's 2000 federal income tax return and that each partner would be "responsible for paying your own taxes out of proceeds allocated to you; however, you will receive funds from the sale of Cap Gemini shares for your tax obligations as they come due." Furthermore, the PID provided that the "fair market value" of the restricted shares would be "calculated at 95 percent of the closing price of Cap Gemini stock" on the closing date for the transaction and that said discount in valuation would "slightly reduce tax due on the Cap Gemini shares received at closing." The PID then went on to explain that "Ernst & Young, its partners, and Cap Gemini will treat valuation and related issues consistently for U.S. federal income tax purposes."

When speaking of the "Forfeiture of Shares" the PID noted at the outset that, although "[a]ll partners will vest in their

shares immediately upon closing," said shares were subject to being forfeited "for breach of their individual Cap Gemini [employment agreements], early departures, or termination for cause."[3] (Stipulation of Facts, Ex. 6 at 13). With respect to the latter basis for forfeiture, the PID observed that the level and amount of forfeiture that would result from a termination due to "poor performance" would not be as steep as it would for some other cause. (*Compare* Stipulation of Facts, Ex. 6 at 15 ("A CS partner will forfeit at least 50 percent of his or her forfeitable shares if he or she is terminated for poor performance") *with id.* at 16 ("a CS partner who is terminated for cause . . . will forfeit . . . all shares still subject to forfeiture"); *see also* Stipulation of Facts, Ex. 7 at 10–11 (also spelling out different forfeiture consequences for dismissal due to "poor performance")). However, in a presentation Ernst & Young made to its consulting partners about the contemplated transaction, the partners were informed that among the "reasons for forfeiture" of the restricted shares of stock was "involuntary termination not for cause," which could lead to "up to 50%" of the partners' "restricted shares" being forfeited. (Stipulation of Facts, Ex. 12 at 16–17). Given that this is the same forfeiture terms for termination allocated due to "poor performance," it would appear that the portion of the power point presentation quoted was simply treating the "poor performance" provision as synonymous to the termination for cause provision, or that the "poor performance" provision was considered a subset of that "for cause." The PID further noted that any partner who later forfeited their shares of Cap Gemini, S.A., stock "likely will recognize a capital loss for federal income tax purposes equal to the individual's tax basis in the Cap Gemini stock surrendered."

The same day the PID was issued to consulting partners, Ernst & Young also made the Master Agreement available to the partners for review. However, the Master Agreement could only be reviewed by consulting partners on a computer with access to the Ernst & Young database and even then the information thereon could not be printed, copied, downloaded or forwarded.

In the Master Agreement it was provided that the sale would be complete on closing. The Master Agreement further provided that "at the closing," Cap Gemini, S.A., shall "deliver to each Accredited Partner (whether directly or by transfer to a Trust on behalf of such Accredited Partner) a number of [Cap Gemini] Ordinary Shares to be determined based upon such Accredited Partner's Proportionate Interest." Schedule 7.7(f) to the Master Agreement stated: "Notwithstanding any other provision of the Agreement, the parties agree that all [Cap Gemini] Ordinary Shares that are not monetized in the Initial Offering will be valued for tax purposes at 95% of the otherwise-applicable market price."

Approval of the Ernst & Young–Cap Gemini, S.A., transaction required that two-thirds (by capital) of Ernst & Young shareholders vote in favor of the transaction. In addition, the transaction required approval by 75% of all consulting partners by headcount. On March 7 and 8, 2000, the consulting partners of Ernst & Young held a meeting in Atlanta, Georgia, to dis-

---

**3.** The PID later redefined "early departure" as indicating when a consulting partner "voluntarily leaves" CGEY and further identified which portions of the employment agreement it was speaking as "the non-competition, non-poaching, or secrecy" provisions. (Stipulation of Facts, Ex. 6 at 15).

cuss the proposed transaction and to vote on whether to approve it.

Nackel attended the March meeting in Atlanta. During that meeting, Ernst & Young consulting partners, including Nackel, had the opportunity to express opinions and to individually ask questions about the proposed transaction—they were not, however, invited or allowed to offer, modify or re-negotiate the terms of the deal that had been struck by Cap Gemini, S.A., and Ernst & Young.

The biggest issue in Nackel's mind when he voted on the agreement was whether Ernst & Young could maintain the consulting practice in light of the SEC's push for divestiture of consulting practices from public accounting firms. At the time that Nackel voted on the transaction, he believed that "clearly we [the consulting practice] were going to be separated from the audit and tax practice." Thus, Nackel concluded that the consulting practice was going to be divested from Ernst & Young either in the Cap Gemini transaction or in another transaction with a different purchaser in a short period of time. At the time Nackel also understood that the agreement required reporting all of the stock allocated to him as income, including the stock in the restricted account (less the 5% discount) on his 2000 tax return. This understanding came from Nackel's review, in late February or early March, of a hypothetical income-tax calculation for a California consulting partner contained in the PID. (Stipulation of Facts, Ex. 6 at CG66–73). Furthermore, Nackel also read the statement in the PID that all shares vest immediately on closing.

Nackel voiced his concern about the Cap Gemini stock being overpriced at the Atlanta meeting. At the time that Nackel voted on the transaction (and continuing thereafter), he was concerned about the possibility of reporting the restricted shares at 95% value in 2000 and then having the shares sink in value, a fear that later proved to be prescient.

Another issue that occupied Nackel was that he was fast approaching the age where he could retire (literally within 18 months). Under the "Rule of 75," meaning when one retires they do so receiving 75% of their annual salary as aggregated over the preceding three years, Ernst & Young applied to partners who retired, Nackel would have received an annual retirement benefit of $700,000 to $800,000 per year under this calculation.

Despite his knowledge of the potential volatility in the price of Cap Gemini stock at the time he voted on the transaction and concerns over the transaction's effects on his plans for retirement, Nackel still decided to vote in favor of the transaction. When at the conclusion of the Atlanta meeting Ernst & Young consulting partners voted by secret ballot on whether to proceed with the proposed transaction, the measure passed with more than 95% of Ernst & Young's consulting partners, including Nackel, voting in favor of proceeding with the transaction.

Upon the transaction's approval, each consulting partner was presented transaction documents, including a Consulting Partner Transaction Agreement ("CPTA"), to sign, confirming their approval of the transaction. Section 10 of the CPTA provided for the grant of a power of attorney (the scope and length of which is disputed by the parties) over restricted stock held in these escrow accounts to Terrence R. Ozan or any successor of Ozan as CEO of CGEY and any member of the Board of the same specifically designated for such purpose by Ozan. The stock allocated to the consulting partners in the escrow accounts was subject to a permitted monetization schedule, which was included in the CPTA as follows:

| Event | % Restricted Remaining |
|---|---|
| Prior to 12/31/2000 | 100% |
| Prior to first anniversary | 75% |
| Prior to second anniversary | 56.7% |
| Prior to third anniversary | 38.4% |
| Prior to fourth anniversary | 20% |
| Prior to 4 year 10 months | 10% |

Moreover, the stock was further restricted in that it could not be sold, assigned, transferred or otherwise disposed by the partner while it sat in the escrow account, except in limited "Permitted Divestitures." Furthermore, the partners bore the risk if the restricted stock value declined in value, but by the same token bore the fruits should it rise in value while it sat in the escrow accounts. Once "monetized," shares were not immediately sold. Instead, they were put up for sale in a Dutch auction format, which guaranteed neither the sale of the stock nor the value at which it would be sold. Finally, while in the escrow account, the powers of attorney signed by the consulting partners gave control over those shares, including rights to vote the shares for shareholder meetings, to Mr. Orzan.

The CPTA also noted that all or some of this restricted stock placed in these escrow accounts could also be forfeited at any point during this five year period if any of the following conditions occurred: (1) voluntary departure from CGEY; (2) termination for cause; (3) violation of the non-compete clause, and (4) termination due to "poor performance."

As to the mechanics of placement of the restricted shares into the accounts themselves, section 2 of the CPTA provides: "At the Closing, without any further action by you, all of your right, title and interest in and to Your Newco Interest will be transferred to Cap Gemini. In exchange, you will receive from Cap Gemini the number of Cap Gemini Shares ("Your Cap Gemini Shares") specified in Your Share/

Cash Statement." Section 2 of the CPTA further provided that the shares "will be deposited by Cap Gemini directly in" the consulting partners' restricted account.

These transaction documents also contained further information delineating the terms of the transaction vis-a-vis what the consulting partners would receive in exchange for their interest in the Ernst & Young consulting practice. One of these transaction documents, a Merrill Lynch "Special Account Instruction Agreement," (that was signed by Nackel and all other consulting partners) concerns the operation of the escrow accounts. The Special Account Instruction Agreement specifically referenced Section 10 of the CPTA that the "Account Holder" appoints an "Authorized Signatory" "to act for the Account Holder in any way with respect to the matters contemplated by the Partner Transaction Agreement. Such power of attorney is irrevocable." The "Account Holder" was the consulting partner and the "Authorized Signatory" was the CEO of CGEY (at the time Terrance Ozan) or a designated successor to him. The Special Account Instruction further provided that "upon written notice by an Authorized Signatory, Merrill Lynch will comply with directions and instructions of the Authorized Signatory without consent of the Account Holder or any other person or entity."

The transaction documents allowed a partner to elect to sell up to 25% of his total allocated shares of Cap Gemini stock at closing. The reason why the transaction authorized an immediate sale of up to 25% of the allocated shares was to provide the partners with available funds to pay federal and state tax on the capital gains that would be generated by the receipt of the entire amount of stock allocated to the partners. If there was a forfeiture of an individual partner's shares, the shares

would revert back to Cap Gemini. On Cap Gemini's returns, the shares would be treated as a reduction in the purchase price of the Ernst & Young consulting practice.

Under section 5(b)(x) of the CPTA, each Ernst & Young consulting partner that agreed to the transaction represented and warranted that he or she (I) had read the PID and the transaction documents, (ii) was not relying on information other than the PID and the transaction documents, and (iii) had an opportunity to ask questions about the terms and conditions of the transaction. Under section 5(b)(xii) of the CPTA, titled "Taxable Transaction; Tax Reporting," each Ernst & Young consulting partner that agreed to the transaction represented and warranted that he or she (I) understood that his or her receipt of Cap Gemini shares was a taxable transaction, and (ii) acknowledged his or her obligation to treat and report the transaction in the manner provided in sections 7.7(f) and 7.7(h) of the master agreement.

Nackel believed that he had to sign the CPTA or he would not have a job. Specifically, it is asserted that at some point *after* the Atlanta meeting Nackel was informed by the head of Ernst & Young's consulting practice, Mr. Wartluft, that Nackel could not stay at Ernst & Young (presumably at its tax or audit groups) because Wartluft "couldn't let the floodgates open up" and "remaining at Ernst & Young was not an option." (Nackel Depo. at 211 (Noting that the conversation with Wartluft occurred "[ba]sically ... between the period of the March partner meeting and the May transaction")). Nackel did not approach anyone other than Wartluft after the meeting in Atlanta about the possibility of staying at Ernst & Young.

Nackel closely read the transaction documents, including the master agreement, before signing the CPTA. Nackel believed

that the goal of the sale of Ernst & Young's consulting practice to Cap Gemini was to create a "global consultancy that would be dominant in a few sectors and in a few technical areas." The principal asset that Cap Gemini was purchasing through the transaction was the individual consultants and their expertise.

Nackel signed the transaction document at his office in Los Angeles on April 27, 2000. No one else was present at the signing except Nackel, his wife, and a notary. Before signing the CPTA, Nackel received advice from his tax advisor. Nackel's tax advisor advised him that there were different tax treatments possible for the transaction. Nackel's tax advisor agreed that the transaction yielded a capital gain instead of an ordinary gain. Nackel further acknowledged that he bore the risk that the value of the Cap Gemini shares could decrease.

### C. *Post–Transaction*

On or about May 23, 2000, Ernst & Young paid to Nackel (1) the total cash amount of his Ernst & Young partnership capital, current, and deferred income accounts, less any amounts he owed to Ernst & Young or to Ernst & Young's lenders under Ernst & Young's capital loan program, (2) a cash distribution of accrual earnings for the portion of Ernst & Young's fiscal year 2000 that he was a partner of Ernst & Young, and (3) the pension funding computed (as of March 31, 2000) as described in the PID, in consideration for the termination of his partnership interest in Ernst & Young. Thus, on termination of his partnership interest in Ernst & Young, Nackel was paid the balance of his interest in the partnership. The amount he received for his capital account was in excess of $800,000.

Nackel was then allocated 35,750 shares of Cap Gemini stock for his interest in

Ernst & Young's consulting practice under the formula contained in the transaction documents. The market value of these shares on the day the sale closed was about $5.4 million. (Stipulation of Facts, Ex. 15 at ADM0256). Of these, 26,812 shares were deposited in the Merrill Lynch restricted escrow account; the remainder (8,938 shares) were immediately sold for approximately $1.4 million, which was distributed to Nackel to cover the income taxes he incurred as a result of the transaction.[4]

On his original 2000 federal income tax return, Nackel reported capital gain on the entire 35,750 shares of Cap Gemini stock he was allocated consistent with expressed intent of the parties to the agreement. In 2000, Nackel completed a Form 1040, Schedule D, reflecting that he had received $5.4 million in stock, taxable at ordinary-income rates, from the sale of his Ernst & Young partnership interest. (Stipulation of Facts, Ex. 15 at 19). On his original 2000 federal income tax return, Nackel valued 26,812 of the shares (that is, those that were placed in the restricted escrow account) at 95% of their face value again consistent with the expressed intent of the parties to the agreement. Nackel used the cash receipts and disbursement method of accounting for federal income tax purposes.

On its 2000 federal tax filings, Ernst & Young as a firm also reported the transaction consistent with the intent expressed by the parties in the agreement.

When the transaction closed, Nackel left Ernst & Young and became a vice president of a Cap Gemini subsidiary. While at Cap Gemini, Nackel held two successive positions: Nackel was in charge of New Ventures and later he was CEO of Sogeti, a subsidiary of Cap Gemini. Cap Gemini later terminated Nackel's employment on November 4, 2001, resulting in the forfeiture of all of his remaining restricted shares of stock in the escrow account (which at that time was 20,258 shares). (Nackel Depo. at 193, lines 10–20). All of those shares were later returned to Nackel as part of a settlement of a wrongful termination lawsuit he filed against CGEY, although it is unclear whether those returned shares were still left subject to the monetization restrictions. However, in that subsequent employment litigation with Cap Gemini, Nackel never asserted that the transfer of shares that occurred on May 23, 2000, should be invalidated.

Upon his termination, Cap Gemini's tax returns treated the forfeited shares as a reduction to the purchase price to acquire Ernst & Young's consulting practice, rather than as income to Cap Gemini in the year the shares were forfeited to Cap Gemini.

Within six months after being terminated from Cap Gemini, Nackel found employment with another business. At no point did Nackel ever bring suit against Ernst & Young or Cap Gemini seeking to void the contract as a whole or complaining the terms of the deal were switched on him.

Later several other consulting partners (including Nackel) who left Cap Gemini (indeed approximately 95% of the former Ernst & Young partners had departed from Cap Gemini by the close of the five-year stock divestiture period)[5] filed

---

4. While Nackel believes that about 10% more of the proceeds from the transaction should have been allocated to the consulting partners, he does not contend that the actual allocation used was "inappropriate."

5. Arthur Gordon, a Ernst & Young partner serving in the firm's tax management committee and global director of tax for the consulting practice, later testified that the reason for this nearly complete lack of retention for for-

amended 2000 federal tax returns seeking to re-characterize the tax treatment of the Cap Gemini restricted shares they were allocated but that were not immediately monetized in 2000. To that end, on or about June 20, 2003, Nackel filed an amended federal income-tax return for the year 2000. Nackel now took the position that only the $1.4 million distributed from the account was income in 2000. (Stipulation of Facts, Ex. 16 at ADM022). The remainder was calculated on the amended return as not having been received due to the forfeiture of the stocks in 2003. The IRS thereafter, apparently without consulting with how other participants to the transaction had been treated, paid Nackel a refund of $958,219, of which $118,133 was applied to a later year's tax liability—per Nackel's request—while a check was issued to Nackel in the amount of $840,086 for the remainder. Contending the refund was mistaken, the government filed the instant suit to reclaim the money.

## II. ANALYSIS

This matter turns on what to do, for purposes of calculating income accrued, with those shares in Cap Gemini stock that Nackel "received" (in the colloquial sense) as part of the sale of the Ernst & Young consulting practice (of which he was a partner) to Cap Gemini in 2000, but which were placed in a reserve escrow account managed by Merrill Lynch and which contained many restrictions as to the shares' alienability as well as forfeiture conditions that were gradually shed with the passage of time. Are the shares includible as taxable income when initially placed in the reserve escrow account or are they taxable as income when the restrictions and forfeiture conditions are lifted on them (here

said restrictions continuing to exist on diminishing portions of those shares until four years and ten months after the transaction)? No one disputes that the value of those shares would, at some point, be includible as income for the former Ernst & Young consulting partner; instead, the issue in this case is one on the timing of the taxability of those shares.

Much of the parties' arguments in this regard have been misspent in sparring over whether Nackel's efforts to have the value of those restricted shares includible as income to the time when the restrictions/forfeiture conditions were lifted on them somehow constitutes a re-characterization, for tax purposes, of the Ernst & Young–Cap Gemini transaction itself.

The government's principal argument is that Nackel and the other ex-consulting partners are bound by their own expressed *intended* characterization of the tax consequences for the transaction as one in which all shares were "received" (for tax purposes) in 2000 even though now market conditions (namely, the collapse in price of Cap Gemini shares following the close of the transaction) have proven such a characterization as being economically disadvantageous. As the Supreme Court remarked long ago, re-characterizing the *form* of a transaction for tax purposes is not favored:

> While a taxpayer is free to organize his affairs as he chooses, nevertheless, once having done so, he must accept the tax consequences of his choice *whether contemplated or not,* and may not enjoy the benefit of some other route he might have chosen to follow but did not.

mer Ernst & Young consulting partners within five years of the transaction's closing was due to the fact "that the financial results of the entity did not support the [continued] high price of the former E & Y partners. Therefore, they were replaced with people who had potentially different skills at a lower price." (Gordon Depo. at 143–45).

*Commissioner v. National Alfalfa Dehydrating and Milling Co.,* 417 U.S. 134, 149, 94 S.Ct. 2129, 40 L.Ed.2d 717 (1974) (emphasis added). Neither side disputes this general principle, but that is not what Nackel is seeking to accomplish here.

■ Parties may intend many things, but it is the *form* of the transaction they employ from which tax consequences flow. The government impermissibly conflates case law concerning a party's effort to look through and re-characterize the *form* of a transaction with that which addresses what the parties' *intended* would be the tax consequences of a transaction. The former is subject to the heightened scrutiny sought now by the government, the latter is not. Indeed, much of the government's argument (and those courts that have adopted its position) on this point is directed exclusively to portions in the transaction documents that express what the parties' intended, expected, or agreed to characterize the transaction for tax purposes, rather than on focusing on the substance of the transaction itself to make such a determination.[6] This focus was tellingly revealed during oral argument, when government counsel remarked that Nackel impermissibly sought to undo what "the parties [had done] in [the] transaction; *intended* for actual receipt; had *motivation* for doing that because of the favorable tax consequences for actual receipt." As ably explained by the Seventh Circuit rejecting

the same argument now pressed by the government in the context of another ex-Ernst & Young consulting partner:

That a transaction's form determines taxation is (or at least should be) common ground among the parties. If private parties structure their transaction as a sale of assets, they cannot later treat it for tax purposes as if it had been a merger.... [Similarly,] if Cap Gemini *transfers* stock in 2000, cash-basis taxpayers, [like Nackel], cannot treat the income as received in 2001 or 2003, even though it would have been child's play to the deal so that the income was received in those years. [The problem is that is not what Nackel is arguing. His] arguments are not ones as if [he] were trying to report an asset sale as a merger or income received in 2000 as if it had been received in 2003.[He] does not want to proceed *as if* the deal had different terms. [He] argues instead that the deal's *actual* terms have tax consequences different from those that his contracts with Ernst & Young and Cap Gemini required him to report in 2000.... Private parties can contract about when income is received [ (colloquially speaking) ], to be sure, but the tax rules about realization and recognition are extrinsic. People determine what transactions to engage in; federal law then specifies how much tax is due.

---

6. This has led the government (and again those courts adopting its approach) to consider application of the body of law where courts, utilizing different but nonetheless stringent standards, have allowed taxpayers to recharacterize the tax consequences of transactions different from how it was allocated in the parties' agreement. *Compare Commissioner v. Danielson,* 378 F.2d 771 (3rd Cir.1967) (allowing a taxpayer to attack a contract provision's (that he was a party to and had given assent to) valuation on the allocation of different shares of stock only "in cases of fraud, duress or undue influence")

with *Berry,* 2008 WL 4526178, at *4 (quoting First Circuit case expounding the "strong proof" test whereby "the allocation in the agreement [of the parties in the sale of a going business] presumptively controls the tax consequences of the purchase" unless the taxpayer can overcome that presumption with " 'strong proof' that at the time of execution of the contract, it was the intention of the parties to allocate a different amount" to the item in question, here the restricted shares of stock): *see also Fletcher,* 2008 WL 162758, at *9 (quoting cases employing strong proof test).

Because [Nackel] does not try to re-characterize the transaction [but instead argues about what the substance of the deal's terms mean taxwise], doctrines that limit or foreclose a taxpayer's ability to take such a step are beside the point.

*Fletcher*, 562 F.3d at 842–43 (emphasis added).

So how should the substance of the chosen form of the Ernst & Young—Cap Gemini transaction be characterized for tax purposes for the individual ex-Ernst & Young consulting partners, notably for purposes of this case, the realization on the value of the shares of conveyed Cap Gemini stock?

As recited earlier, the shares of Cap Gemini stock were deposited into the ex-consulting partners' individual escrow accounts, but those accounts were restricted, and the transaction itself placed forfeiture conditions on those shares while they remained restricted. The ex-consulting partners did, however, actually receive 25% of the shares in the form of cash at the transaction's closing in 2000 (the remainder could only be received in increments as the restrictions were lifted over the course of the next four years and ten months).

■ The Tax Code requires taxpayers like Nackel, who use the cash receipts and disbursements method of accounting, to report income in the tax year that they actually or constructively "receive" it. *See* 26 U.S.C. § 451(a) ("The amount of any item of gross income shall be included in the gross income for the taxable year in which received by the taxpayer"); 26 C.F.R. § 1.451–1(a) ("Gains, profits, and income are to be included in gross income for the taxable year in which they are actually or constructively received by the taxpayer"). Put simply, each ex-consulting partner was required to recognize as present income the value of the shares of Cap Gemini stock during the tax year in which he or she "received" said shares. No one seriously argues that Nackel or any of the other ex-consulting partners actually received the restricted shares in 2000 (at best, the ex-consulting partners received a right to the shares); instead the question concerns one of constructive receipt.

■ A taxpayer constructively receives income when "it is credited to his account, set apart for him, or otherwise made available so that he may draw upon it at any time, or so that he could have drawn upon it during the taxable year if notice of intention to withdraw had been given." 26 C.F.R. § 1.451–2(a). Thus, the key criterion for constructive receipt is one of control. Reflecting the centrality control plays in this analysis the IRS regulation repeatedly emphasizes the lack of such "control" over something as demonstrating that the taxpayer is not in constructive receipt of it. *Id.* Thus, the regulations recognize placement of impediments on control of the disposition of an asset as demonstrating the lack of constructive receipt. Critically, if the taxpayer's "control" of his or her receipt of income "is subject to substantial limitations or restrictions," then no constructive receipt has occurred and hence said item need not be reported as gross income for that taxable year. *Id.* Whether a source of income is subject to substantial limitations or restrictions has not been defined by the Treasury Regulations or the Tax Code, but has been filled in by the courts.

Nackel cites to a number of decisions where courts have held that restrictions on the alienability of shares of stock were considered substantial ones so as to preclude the stock's value from being reported as income for that taxable year. *See International Trading Co. v. Commission-*

*er*, T.C. Memo 1958–104 (1958) (shares of stock were placed in escrow account pending potential claims made by creditors, determined not taxable: "the fund deposited in escrow was not in the possession or control of the taxpayer during [the relevant time]"); *Goetze Gasket & Packing Co. v. Commissioner*, 24 T.C. 249, 1955 WL 564 (1955) (determined that even though taxpayer received dividends on shares allocated to it by a purchase agreement, because the shares were withheld by the seller to guard against breach of warranty claims the value of those shares was not includible as income in the year of the purchase agreement); *Estate of Bette v. Commissioner*, T.C. Memo 1977–404 (1977) (determined funds received by taxpayer and then deposited in escrow account pursuant to terms of purchase agreement were not includible as income despite the fact "taxpayer received the entire contract price from the corporation and then forthwith placed a portion thereof in the escrow account (as required by the contract of sale)").

Here, however, the restrictions involved concern matters exclusively within the ex-consulting partner's hands to control. The only person standing in the way of Nackel actually exercising dominion over the shares themselves was himself. So long as he did not engage in conduct amounting to cause to fire him, or did not quit his position at the firm, or did not breach non-disclosure provisions, the shares in the restricted escrow account were his. Admittedly, Nackel and the other ex-consulting partners not only faced the prospect of forfeiture for their own act but also agreed not to sell their interest in those shares as they sat in the escrow account awaiting the periodic lapse of restrictions on portions of them. Does not this lack of alienability itself impact how much of the stocks are includible as income in 2000? The short answer is yes, and this is reflected in the transaction documents themselves that discounted the present value of the shares held in the account. Nackel strenuously argues that the discounted value was too little to reflect the real market value of those shares, especially given the length of time the shares were placed in such restricted accounts and the risks inherent in the venture itself. That may be, but that is not a question of constructive receipt but one of proper valuation.

As ably explained by the Seventh Circuit by way of analogy to a zero-interest coupon:

Imagine that, instead of providing for payment in stock, the contract among Ernst & Young, Cap Gemini, and the partners had called for some cash in 2000 plus a zero-coupon bond, handed over to the ex-partner in 2000 and maturing in 2005. That bond is income in 2000, even to a cash-basis taxpayer, because it is property that can be sold in the market. Suppose [further] that the partners also made side agreements with Capgemini not to sell their bonds for five years.... An agreement not to sell would not change the nature of the bonds as property, and thus income, received in 2000. But deferral of the right to sell would reduce the value of the bonds, and hence the amount of income, because an illiquid asset is worth less than a liquid one. Whether the security is handed over to the ex-partner with a legend reflecting the limits on sale, or instead is handed to an intermediary such as Merrill Lynch with instructions to enforce contractual restrictions on the sale of an unlegended security, should not matter for tax purposes.

*Fletcher*, 562 F.3d at 843–44.

Thus the restrictions placed on the escrow accounts preventing ex-consulting partners from selling or otherwise trading

in the value of the shares did not impact their control over the shares—only the value that should be placed on those shares when first constructively received by the ex-consulting partners in 2000. Nackel disputes the discount in valuation the transaction documents placed on the restricted shares, arguing by way of an expert that said shares should have been discounted to 55% of their face value on account of the length of the restricted period and again the nature of venture involved. Perhaps he is correct, perhaps not. Again, the discount is accorded based on the benefit of hindsight—because the shares collapsed in value, there is a corresponding attempt to reflect what in fact occurred in retrospectively valuing those shares. But there was also the possibility that the exact opposite could have occurred, namely, that the shares' value could have risen, as the parties had expected, during the intervening period. And it is precisely this fact—the risk and benefits in the value of the shares-that bolsters the finding that, the alienability restrictions notwithstanding, Nackel did indeed have constructive receipt of those shares. Nackel "and the other ex-partners stood to receive the entire market gain, and to bear all loss, from the moment the transaction closed in 2000. That feature of the deal shows that the stock was in [his] constructive possession in 2000." *Id.* at 844.

Although Nackel now claims that the discounted value was too little, it is equally important to remember that he agreed to the amount of the discount. His assent to the discount rate forecloses re-consideration of that fact, especially insofar as constructive receipt is concerned. *Id.* ("an ex-partner would be hard pressed in light of this agreement [to the discount rate] to argue that the discount should be 10% or 20%").

■ This then leaves the forfeiture provisions. Undoubtedly these forfeiture provisions were put in place to encourage the ex-partners to adhere to certain contractual promises made (namely, those relating to non-compete clause), but also to dissuade an early exodus from the newly formed venture (namely, the voluntary departure provision) and maintenance of quality of product (namely, the termination for cause provision). As the Seventh Circuit observed, "[s]everal courts have held that, where stock is transferred under a sales agreement and held in escrow to guarantee a party's performance under the agreement, the party 'receives' the stock when it is placed in escrow rather than when it is released." *Id.* (citing *Chaplin v. CIR*, 136 F.2d 298, 299–302 (9th Cir.1943)). The likelihood of the forfeiture provisions being effectuated, and who controls the realization of that fact, are important in determining whether the stock so held is nonetheless constructively received. *Id.* ("the more likely it is that the conditions will be satisfied, and all restrictions lifted, the more sensible it is to treat all of the stock as constructively received when deposited in the account"). In this respect, the fact that the contingencies that would lead to such forfeiture were all well within the ex-partners' control is determinative. *Id.* at 845.

Nackel disputes this finding of the Seventh Circuit, commenting that the court "conspicuously" omitted from its list of forfeiture methods the termination of the ex-consulting partner for no cause. (Defs' Response at 4 n. 1). It is, however, Nackel who is mistaken in this regard; what he cites to support his assertion that there was such a forfeiture condition does not contain that condition. Section 9 of the CPTA identifies the following as events that will lead to forfeiture: "breach of the provisions set forth in Annexes 1, 2 and 3 of the CG agreement," (that is, the non-

compete clauses), "terminate your employment with CGE & Y voluntarily," (that is, the partner quitting his or her job) "or are terminated by CGE & Y for cause." None of these forfeiture conditions are out of an ex-consulting partner's control.

Later in the same section the CPTA speaks specifically about the consequences and procedures for forfeiture in the instance of being "terminated by CGE & Y for poor performance." Although Nackel would wish to have the Court to read the "poor performance" condition as being a proxy for simple termination (with or without cause), that is not how it is written. Given the order in which this particular section appears, it is clear that in speaking of "poor performance" the CPTA was either re-phrasing the "terminated for cause" condition or was speaking of a subset of being terminated for cause. Such a reading is buttressed by the fact that, in the PID, the "poor performance" language is not itemized among the forfeiture conditions themselves, but is recited in the paragraph immediately thereafter discussing the itemized conditions, including that of termination for cause.

Regardless, the condition itself as written is one concerning the poor quality of the ex-consulting partner's performance. Perhaps such performance is insufficient to warrant a for cause termination, a supposition supported by the fact that, unlike with forfeiture for cause, forfeiture under "poor performance" led to a possible lesser form of penalty. Nonetheless, the emphasis under this condition remains on the partner's relative performance; this is an objective measure that, like the other conditions, is something within that partner's means to control. The Seventh Circuit apparently did not mention the condition as it was either redundant, merely repeating a lesser form of the termination for cause condition, or was but another measure equally within the ex-consulting partner's control. In the absence of any other evidence substantiating or even suggesting that the "poor performance" condition is anything but what it states (either a recantation of the "for cause" condition or yet another objective-based condition, gauged by measuring the partner's performance) there is no dispute for which a trier of fact is needed to resolve.

Nackel also takes exception to the Seventh Circuit's alleged omission to consider that the powers of attorney over the restricted stock in escrow account conferred by the consulting partners to CGE & Y management was "pervasive, all-encompassing, and completely controlling." This is also misplaced. Such pervasive control was needed in order for the restrictions and forfeiture conditions placed on the stocks held therein to be effective. Indeed, this was identified in the CPTA as the avowed purpose for instituting the powers of attorney conferred by the consulting partner. (*See* Stipulated Facts, Ex. 7 at CG96 to 97 (power to "implement the procedures for enforcing the restrictions on transfer and liquidated damages provisions of the transaction documents and implement the resale of Cap Gemini shares in the offerings and otherwise as contemplated by the transaction documents")). There is nothing in the powers of attorney suggesting that somehow they remained on those shares even after the restrictions and forfeiture mechanisms had been lifted by the passage of time. Nor is there any provision or suggestion that such a power of attorney could lead to the dissolution or diminution of the number or value of the shares themselves. Mr. Orzan was given control over the shares to insure that the transaction as structured was carried out and was given the additional ability to utilize the voting powers of those shares.

This leaves Nackel's final argument: That he did not intend to enter into the transaction, and that if he did so intend his assent was procured by duress. These arguments are familiar ones, all having been previously made and then rejected by other courts who have considered the Cap Gemini—Ernst & Young transaction. Much like those cases, the Court similarly finds little merit to any of Nackel's contract-based arguments.

Nackel asserts that the consulting partners "had no bargaining power; no one represented their interests at the bargaining table," thus leaving the consulting partners with "no meaningful opportunity to negotiate and choose the terms of the contract" most important to them, namely, the valuation of the restricted stock, and that in the end this led to a contract that grossly overvalued the restricted stock upon which were placed "onerous" restrictions and terms. (Opp. at 15). This assertion, however, is refuted by the fact that the transaction could be approved and the sale of Ernst & Young's consulting practice to Cap Gemini effectuated only if 75% of the consulting partners voted for the deal. Thus, the assent of the consulting partners, in fact the assent of a vast majority of the consulting partners, was a critical item to the deal going forward.

Moreover, unlike other consulting partners, Nackel was a member of the Ernst & Young's America's Executive Committee which, by his own admission, engaged in a "top-down review of the transaction" back in October or November of 1999, months before other consulting partners were even aware of the potential deal. Far from suggesting that the contract was foisted on the consulting partners, the need for such a sizeable portion of them to agree to the deal demonstrates that they were an integral party to the deal. This refutation of Nackel's argument was made by the *Berry* court:

> The undisputed facts belie her claim that she was a third party with no bargaining power. Several partners from Berry's consulting practice group directly participated in the stock transaction negotiations on behalf of all the consulting partners, including Berry. All consulting partners were invited to participate in the two-day meeting held in March, 2000 to discuss the proposed transaction. After the meeting, each consulting partner was given a paper ballot on which he or she could privately vote for or against the transaction.... Approval of the transaction required at least a seventy-five percent favorable vote by all consulting partners. The consulting partners voted ninety-five percent in favor of the transaction. Berry does not claim that she was not at the March 2000 meeting, or that she voted against the transaction. The involvement of the negotiating partners, Berry's opportunity to participate in the March 2000 meeting, and her ability to vote all show that Berry was a party to the transaction with bargaining power.

*Berry*, 2008 WL 4526178, at *4.

As to the valuation issue, it must be noted that even Nackel's own expert initially argues that "no fair market value could be ascertained for the subject shares" on account of the restrictions placed on them. Far from undermining the transaction such a concession could be seen as giving *more credence to* the valuation that was placed on the shares by the parties who were in the best position to know—the owners of the subject companies. Perhaps Nackel's expert's subsequent effort at valuation is right or perhaps it is not. The point being that the expert's concession of being unable to place a value can just as well be used as a

means to justify the valuation that the parties to the contract ultimately decided to place on those shares, not the converse. The court in *Berry* similarly rejected much of the same argument that Nackel is raising here:

> Berry has presented no competent evidence to show that the terms of the transaction were unreasonably favorable to Ernst & Young or Cap Gemini. Even accepting the fifty-five percent valuation in Losapio's report, this alone does not show that the ninety-five percent valuation in the transaction was unreasonably favorable to Ernst & Young or Cap Gemini over her.

*Berry*, 2008 WL 4526178, at *6.

Finally, Nackel argues that his assent to the deal was procured by duress, namely, that he was told that "if he did not sign the transaction documents and agree to become an employee of Cap Gemini that he would not have a job." (Opp. at 16–17). Nackel deceptively mis-characterizes the evidence in the record on this point. Nackel was not told that if he did not agree to the Cap Gemini transaction he would be fired. Instead, Nackel was allegedly told (this point being challenged by the government as hearsay) by the consulting practice's Vice President, Mr. Wartluft, *after Nackel had already attended the March meeting in Atlanta, having voted in favor of the transaction, and the transaction having been approved by over ninety percent of the consulting partners,* that Nackel could not thereafter transfer to another practice group (tax or audit) within Ernst & Young. This is a far cry from the allegations in other Cap Gemini–Ernst & Young cases where the consulting partners involved alluded to (but were never able to substantiate) to fears of being fired if they did not assent to the deal leading up to the March meeting in Atlanta.

As the Seventh Circuit persuasively commented when presented with a similar argument:

> If she had voted no and refused to sign, she maintains, she would have been excluded from the economic benefits and might have been fired. If this is so, then she had a difficult choice to make; it does not relieve her of the choice's consequences. Hard choices may be gut-wrenching, but they are choices nonetheless. Even naive people baffled by the fine print in contracts are held to their terms; a sophisticated business consultant who agrees to a multi-million-dollar transaction is not entitled to demand the deal's benefits while avoiding its detriments. The argument that Fletcher can avoid the terms as a matter of contract law is frivolous.

*Fletcher*, 562 F.3d at 842.

To that end, it must be noted that, despite Nackel's great and prolonged efforts *in this litigation* to have his assent to the Cap Gemini deal declared involuntary and unconscionable, at no time after the deal in 2000 up to the time of this lawsuit (including after Nackel was fired from Cap Gemini) did he file a lawsuit or take any action to have the deal (which would have included his receipt of the undisputed income from the 25% worth of unrestricted shares he realized in 2000) undone. Indeed, the limitations period has long since elapsed on his ability to challenge the enforceability of the transaction documents in any civil court (aside from the present tax matter). In essence, Nackel wants to have the deal undone for purposes of the tax consequences flowing from it, but has done nothing to unwind the deal so as to require him to give up the benefits he received from the deal. It is exactly this discrepancy that Nackel's position (and those of other ex-consulting partner's challenges that have occurred throughout the coun-

try) would cause between what benefits and losses he would take from the deal in the real-world compared to what he wishes for the Court to recognize for purposes of the tax laws that is the fundamental stumbling block to his effort to re-characterize the transaction now.

Nackel's repeated refrain that he is "not seeking any unjust enrichment" rings hollow as he fails to grasp that, in attacking the contract's enforceability insofar as the restricted shares are concerned, he nonetheless is unwilling to relent from the benefits he gained from that same supposedly unconscionable transaction, namely, the money he received on the unrestricted shares of stock. If the contract is as fundamentally flawed and procured by duress as he claims, then Nackel cannot continue to retain those benefits but let go of the now realized (but then not) downside on the deal.

Nackel is correct that the other district court decisions upholding the government's effort to rescind the refund cannot be simply cut and pasted to reach a decision in this case, the result in each case will turn on the particular facts and circumstances that the consulting partners confronted. That said, Nackel like the consulting partners in the other cases, knew what he was voting on, he assented to the transaction by voting for it, and his claims of being coerced into the deal fall flat. There may be a case out there where a consulting partner voted against the deal and was told that if he or she did not vote for the deal they would be fired, but *this is not that case.*

## III. CONCLUSION

Accordingly, although the Court agrees with Nackel that he is entitled to contest the tax treatment for the restricted shares of stock called for by the 2000 transaction documents, the Court holds that the

shares are taxable in 2000 at their value on the date of deposit in the Merrill Lynch escrow accounts. "Income was constructively received in that year not because the contract said that everyone would report it so to the IRS, but because the parties were *right* to think that this transaction's actual provisions made the income attributable to 2000." *Fletcher,* 562 F.3d at 845. The government is therefore awarded summary judgment in its favor and Nackel must repay the refund paid to him and his wife by the IRS.