William F. and Therese **HARTMAN,** Plaintiffs,

v.

**THE UNITED STATES, Defendant.**

No. 05–675T.

United States Court of Federal Claims.

May 13, 2011.

Kenneth R. Boiarsky, El Prado, NM, for plaintiffs.

Benjamin C. King, Jr., United States Department of Justice, Washington, DC, for defendant.

## OPINION AND ORDER

SWEENEY, Judge.

As a result of Ernst & Young LLP's sale of its consulting services business in 2000, William F. Hartman received stock in Cap Gemini, S.A. He and his wife, Therese Hartman, reported the receipt of that stock as income on their 2000 federal income tax return and paid the resulting tax. They now seek a partial refund of the tax they paid, alleging that Mr. Hartman did not receive all of the stock in 2000. The parties' cross-motions for summary judgment are presently before the court. For the reasons set forth below, the court concludes that the Hartmans are not entitled to a refund. It therefore denies plaintiffs' motion and grants defendant's motion.

## I. BACKGROUND[1]

### A. The Transaction

Up until the year 2000, Ernst & Young LLP ("Ernst & Young") was an accounting firm that provided its clients with, among other things, auditing and consulting services. In December 1999, Ernst & Young announced that it had reached a tentative agreement with Cap Gemini, S.A. ("Cap Gemini") regarding the sale of its consulting services business. The two firms executed a Master Agreement outlining the terms of the transaction on February 28, 2000. Briefly stated, Ernst & Young intended to create a new limited liability company, transfer its consulting services business to the new company, and then distribute a portion of the interests in the new company to its partners.

---

1. The court derives the facts in this section from the parties' Joint Stipulation ("JS"), the parties' joint exhibits ("JE"), and the following deposition testimony supplied by defendant: the deposition of Arthur J. Gordon on August 12 and 21, 2008 ("Gordon I Dep."); the deposition of Arthur J. Gordon on September 14, 2009; and the deposition of William F. Hartman on March 11, 2008 ("Hartman Dep."). The joint exhibits are consecutively marked with Bates numbers. Thus, the court's citation to these exhibits will refer to the Bates number, not the exhibit number.

All of the partners would then immediately sell their interests in the new company to Cap Gemini in exchange for shares of Cap Gemini common stock, and the partners in the consulting services business ("consulting partners") would become employees of Cap Gemini. The Cap Gemini stock received by the partners would be held in a custodial account and subject to certain restrictions described in other documents to be executed by the partners.

According to Arthur J. Gordon, Ernst & Young's global director for tax consulting services at the time of the transaction and Cap Gemini's North America director of tax for the five years following the transaction, the transaction was structured as a full exchange of Ernst & Young's consulting services business for Cap Gemini stock. Mr. Gordon indicated that this structure served three purposes. First, it allowed all of the Ernst & Young partners—both consulting and nonconsulting partners—to be treated equally. Second, it permitted the consulting services business to have a clean break from Ernst & Young, thus satisfying the United States Securities and Exchange Commission's concerns regarding a single firm offering both auditing and consulting services to its clients. And, third, it ensured that all of the involved parties would obtain their value at one point in time and that future events would have no effect on that value. For these reasons, Mr. Gordon explained, every partner would immediately vest in all of the Cap Gemini stock they received. Indeed, Mr. Gordon reported that in negotiating the terms of the transaction, the parties rejected any deferred vesting of the Cap Gemini stock because shares of the stock received after the transaction closed might be treated as ordinary income rather than as a capital gain, resulting in less favorable tax consequences.

To inform its partners about the proposed transaction, Ernst & Young provided them with a Partner Information Document on March 2, 2000. The document described the transaction, included a draft of the employment agreement that would be executed by the consulting partners,[2] and supplied information about the Cap Gemini stock that the partners would receive if the transaction was consummated. Specifically, upon the close of the transaction, all Ernst & Young partners would immediate "vest" in their shares, JE 721, and the shares would be placed in the partners' individual custodial accounts. However, the partners' ability to retain and dispose of the shares would be limited. In particular, consulting partners would be restricted in their ability to sell or transfer their shares—they would only be able to "monetize" (*i.e.*, sell) up to fifteen percent of their shares at each anniversary of the transaction's closing. *Id.* at 719. In addition, consulting partners could forfeit a specified number of shares upon the occurrence of certain events: termination for cause; voluntary termination; breach of the noncompetition, nonpoaching, or secrecy provisions of their employment agreements; or termination for poor performance. Consulting partners who were terminated for cause, voluntarily terminated their employment, or breached their employment agreements would lose all of the shares subject to forfeiture. And, consulting partners who were terminated for poor performance could lose less than all, but at least half, of their shares subject to forfeiture if a review committee determined that a lesser forfeiture was warranted under the circumstances.[3]

With respect to the tax consequences of the transaction, the Partner Information Document indicated that "[u]nder Federal income tax law, the gain from the sale of Consulting Services to Cap Gemini [was] a taxable transaction to partners," which was

---

2. The court uses the term "employment agreement" to refer to the document identified in the record as the "Cap Gemini/Ernst & Young Employment Agreement" and the "CG Agreement."

3. The Partner Information Document is not a model of clarity with respect to what constitutes a termination for poor performance. *Compare* JE 723 (listing, separately, four types of separations: terminations for cause, voluntary depar-

tures, breaches of the employment agreement, and poor performance terminations), *with id.* at 724 (noting that consulting partners "separated" for poor performance were those who were asked to leave Cap Gemini "for any reason other than for cause"). This ambiguity is not present in the main transaction documents, as discussed below.

to "be a capital gain transaction, taxable at capital gain rates, with a minimal amount of ordinary income." *Id.* at 710. The taxable gain was to be "measured by the difference between the fair market value of the Cap Gemini shares received and the tax basis of the [new company's] shares for which they [were] exchanged." *Id.* at 726. To ensure that the partners could meet their state and federal income tax obligations, it was proposed that twenty-five percent of each partner's shares would be immediately sold and that the partners could withdraw the proceeds of the sale when their taxes were due.[4] For the remaining, unsold shares, the fair market value was to be "calculated at 95 percent of the closing price of Cap Gemini stock on the day of the exchange for [the new company's] shares," a discount that would "slightly reduce the tax due on the Cap Gemini shares received at closing." *Id.* The Partner Information Document provided that each partner's capital gain would be "reportable on schedule D of [his or her] U.S. federal income tax return for 2000." *Id.* at 727. It also indicated that all of the parties to the transaction—Ernst & Young, the partners, and Cap Gemini—would "treat valuation and related issues consistently for U.S. federal income tax purposes." *Id.* at 726–27.

Consummation of the transaction, according to the Partner Information Document, was dependent upon the approval of two-thirds of all voting partners and seventy-five percent of the consulting partners. The consulting partners were advised to consult with their "own attorney, business advisor, and tax advisor" if they had any concerns about the transaction prior to deciding whether to approve it. *Id.* at 740. In addition, a meet-

ing was scheduled for March 7–8, 2000, in Atlanta, Georgia, to provide the consulting partners with the opportunity to discuss the transaction. The consulting partners would cast their votes regarding approval of the transaction at the close of the meeting.

Prior to the meeting in Atlanta, the consulting partners had the ability to review the Master Agreement and its exhibits. One exhibit was a draft of the employment agreement. Another exhibit was the Global Shareholders Agreement, which was an agreement for some of the new Cap Gemini shareholders that described the restrictions on their stock.[5] Beginning on March 2, 2000, the partners could access the Master Agreement and exhibits on their office computers, but could not print, download, or forward the documents.

The meeting in Atlanta was held as scheduled, and the consulting partners were able to ask questions and have their concerns addressed. The tax treatment of the transaction was discussed, but, according to Mr. Gordon, none of the consulting partners asked any questions regarding taxation. The consulting partners ultimately voted to proceed with the transaction, with more than ninety-five percent of them in approval.

At some point before April 19, 2000, the consulting partners received a Partner Transaction Agreement Kit containing a Consulting Partner Transaction Agreement ("Transaction Agreement"), a Consulting Partner Transaction Agreement Signature Document ("Signature Document"), an employment agreement, and a Special Account Instruction Agreement ("Instruction Agreement").[6] To participate in the transaction,

---

4. The Partner Information Document indicated that these shares would not be subject to forfeiture.

5. By its terms, the Global Shareholders Agreement did not apply to the consulting partners. However, the Transaction Agreement provided that several sections of the Global Shareholders Agreement would apply to the consulting partners.

6. There is some dispute as to exactly when the consulting partners received the Partner Transaction Agreement Kit. Mr. Hartman stated that the only document he received prior to the Atlan-

ta meeting was the Partner Information Document but Mr. Gordon indicated that documents related to the transaction began to be distributed to the partners electronically at least two weeks before the Atlanta meeting. However, the consulting partners must have received the Partner Transaction Agreement Kit by April 19, 2000. On that date, Ernst & Young sent an electronic-mail message to the consulting partners containing a revised Signature Document and instructing them to execute and submit the revised document, even if they had already submitted the initial Signature Document.

the consulting partners were required to execute and deliver the latter three documents by May 1, 2000.

The Transaction Agreement was the vehicle in which the consulting partners became parties to the Master Agreement. To become a party to the Transaction Agreement, and therefore a party to the Master Agreement, a consulting partner was required to execute and deliver a Signature Document. By doing so, a consulting partner agreed that at the transaction's closing, Cap Gemini would deposit a specified number of shares of its stock in a restricted account held at Merrill Lynch in the partner's name. This agreement was also reflected in the Master Agreement, which provided that Cap Gemini would "deliver" shares of stock to the consulting partners as part of the transaction, *id.* at 43, 46; the Global Shareholders Agreement; and the Signature Document, which provided that the consulting partners assented to "hold the Cap Gemini shares issuable to" them in their restricted accounts, *id.* at 614. Both the Transaction Agreement and the Global Shareholders Agreement indicated that the shares would have voting rights attached to them. And the Master Agreement provided that the shares would also have dividend rights. According to Mr. Gordon, the dividend and voting rights were present and immediate ownership rights obtained by the partners as a result of the immediate vesting of their shares. In fact, throughout the transaction documents—particularly the Master Agreement, the Global Shareholders Agreement, and the Transaction Agreement—the consulting partners were referred to as the legal or beneficial owners of the Cap Gemini stock that they were to receive in the transaction.

By becoming a party to the Transaction Agreement, a consulting partner also agreed that the Cap Gemini stock he or she received would be subject to certain limitations de-scribed in the Transaction Agreement, the Master Agreement, the Global Shareholders Agreement, and the employment agreement; namely, the monetization restrictions and forfeiture conditions. The Master Agreement, which provided that the consulting partners would "accept" their stock "subject to the relevant restrictions and other provisions specified" in the Global Shareholders Agreement, the Transaction Agreement, and the employment agreement, *id.* at 45, and that the consulting partners agreed that their Cap Gemini stock might be held in a custodial account "for such periods and on such terms and conditions as are set forth" in the Global Shareholders Agreement, *id.* at 143, was in accord.

With respect to the monetization restrictions, the Transaction Agreement and the Global Shareholders Agreement provided that for a specified period of time, the consulting partners could not "directly or indirectly, sell, assign, transfer, pledge, grant any option with respect to or otherwise dispose of any interest in" their Cap Gemini stock unless the Transaction Agreement and the Master Agreement permitted otherwise. *Id.* at 627, 647. Permitted dispositions included offerings coordinated by Ernst & Young, as described in the Global Shareholders Agreement,[7] and certain, defined "Permitted Divestitures." *Id.* at 627, 648. According to Mr. Gordon, the monetization restrictions were intended to protect the value of the Cap Gemini stock for all partners; if every partner attempted to sell his or her stock at the same time, the supply of the stock on the market would overwhelm the demand, resulting in a plummeting stock price.

With respect to the forfeiture conditions, both the Transaction Agreement and the Global Shareholders Agreement provided that for the four years and three-hundred days following the transaction's closing date,

---

7. The Global Shareholders Agreement contemplated up to six offerings: the initial offering upon the transaction's closing; a supplemental offering on April 1, 2001; offerings on the second, third, and fourth anniversaries of the transaction's closing; and an offering three-hundred days after the fourth anniversary. After the transaction closed, however, the Global Share-holders Agreement was amended to reflect a new monetization procedure. The amendment allowed "flexible periodic sales instead of fixed scheduled annual offerings as provided in the original documents," and was intended to "substantially improve the resale process for ... Cap Gemini shares." JE 680.

consulting partners who were terminated for cause, voluntarily terminated their employment, breached their employment agreements, or were terminated for poor performance could forfeit a specified number of shares as liquidated damages. The Transaction Agreement contained a schedule describing the number of shares held by the consulting partners that were subject to forfeiture at any particular time: 100% of their shares if the forfeiting event occurred prior to December 31, 2000, 75% if the event occurred prior to the first anniversary, 56.7% if the event occurred prior to the second anniversary, 38.4% if the event occurred prior to the third anniversary, 20% if the event occurred prior to the fourth anniversary, and 10% if the event occurred prior to the four-year-and-ten-month anniversary. Upon the occurrence of most forfeiting events, consulting partners would lose all of their shares subject to forfeiture. However, poor performance terminations could result in the loss of less than all, but at least half, of a consulting partner's forfeitable shares if a review committee determined that a lesser forfeiture was warranted under the circumstances. The Transaction Agreement did not address whether shares would be forfeited if a consulting partner was terminated due to a reduction in force. In fact, Mr. Gordon indicated that some former consulting partners who were terminated because there was no business for them at Cap Gemini did not forfeit any shares.

The consulting partners also made a number of representations and warranties upon becoming parties to the Transaction Agreement. For example, they represented and warranted that they were acquiring the Cap Gemini stock "for [their] own account as principal, for investment purposes only and not with a view to, or for, resale, distribution or fractionalization"; that they understood that the shares could "only be resold as permitted"; and that they had "the financial ability to bear the economic risk" of their investment in the stock. *Id.* at 623. They also represented and warranted that they had "read the Partner Information Document and the Transaction Documents," that they were "not relying on any material oral or written representation or oral or written information in connection with the proposed Transactions which [was] not contained in the Partner Information Document or the Transaction Documents," and that they had the "opportunity to ask questions concerning the terms and conditions of the Transaction Documents and the proposed Transactions and other matters pertaining to the Transaction Documents and the proposed Transactions." *Id.* at 624.

Another representation and warranty made by the consulting partners related to federal income taxation. Specifically, the consulting partners represented and warranted that they understood that their "receipt" of stock in the transaction would be "a taxable transaction for U.S. federal income tax purposes" and they acknowledged their "obligation to treat and report the Transaction for all relevant tax purposes in the manner provided in Sections 7.7(f) and (h) of the Master Agreement...." *Id.* Section 7.7(f) of the Master Agreement provided that, pursuant to the relevant regulations, the consulting partners were required "to file with their Tax Returns for the year in which the Closing occur[red]" a statement concerning the sale of the consulting services business to Cap Gemini, and Cap Gemini was required to issue to each consulting partner a Form 1099–B with respect to the same transaction. *Id.* at 122. In addition, Section 7.7(f) indicated that the value of the stock received by the consulting partners would be set forth in Schedule 7.7(f). According to Mr. Gordon, that schedule provided that the value of each share of stock not sold when the transaction closed would be set at ninety-five percent of the share price on the transaction's closing date.[8] He asserted that the five percent discount was negotiated by the parties,[9] and

---

8. Schedule 7.7(f) is not part of the record before the court. However, the parties do not dispute that the transaction documents described a five percent discounted valuation for the unsold shares of stock.

9. Although Ernst & Young preferred a higher discount, it accepted a five percent discount because it was "more concerned with getting some other things that [it] wanted" in the transaction. Gordon I Dep. 52:24–53:9.

that it was meant, at least in part, to reflect the monetization restrictions on the stock. Section 7.7(h) of the Master Agreement provided that the consulting partners agreed, for federal tax purposes, to "treat[ ] and report[ ]" the transaction as a sale of the Ernst & Young partnership interests to Cap Gemini in exchange for Cap Gemini stock and cash. *Id.* at 123–24. They also agreed "not to take any position in any Tax Return contrary to the foregoing without the written consent of" Cap Gemini. *Id.* at 124.

The Transaction Agreement also contained a grant of a power of attorney. The consulting partners agreed to appoint Terrence R. Ozan as their "agent and attorney-in-fact" to act on their behalf "in any way with respect to the Transactions contemplated by each Transaction Document." *Id.* at 630. As the consulting partners' attorney-in-fact, Mr. Ozan had the power to (1) execute the transaction documents and any other documents that he deemed "necessary or appropriate in connection with the Transaction"; (2) take any other action that he deemed "necessary or appropriate in connection with the Transaction," including actions relating to the stock offerings; and (3) "implement the procedures for enforcing the restrictions on transfer and [forfeiture] provisions of the Transaction Documents and implement the resale of Cap Gemini Shares in the Offerings and otherwise as contemplated by the Transaction Documents." *Id.* at 630–31. In addition, reading the Transaction Agreement in conjunction with the Instruction Agreement, the attorney-in-fact had the power to direct Merrill Lynch to transfer shares, vote shares, hold assets, and transfer assets. The consulting partners were warned, in bold, block type, that the power of attorney granted in the Transaction Agreement was "broad and sweeping," could not be revoked, and would continue even if a consulting partner became disabled, incapacitated, or incompetent. *Id.* at 630. They were also advised "to obtain competent legal advice" if they had any questions concerning the power of attorney. *Id.*

In addition to all of the documents described above—the Partner Information Document, the Master Agreement, the Global Shareholders Agreement, the Transaction Agreement, the Signature Document, the Instruction Agreement, and the employment agreement—the consulting partners received information before the close of the transaction related to the monetization of their shares. For example, on April 25, 2000, Ernst & Young sent them a memorandum that explained the monetization schedule and procedure and requested that they make their initial monetization elections. In addition, Ernst & Young scheduled a nationwide computer-based presentation for May 8, 2000, to discuss monetization and the mechanics of the Merrill Lynch accounts.

The transaction closed on May 23, 2000. On that date, pursuant to the transaction documents, the consulting partners terminated their partnership interests in Ernst & Young and Cap Gemini deposited stock into each of their restricted accounts.

## B. Reporting the Transaction for Tax Purposes

According to Mr. Gordon, the transaction had been structured so that all of the parties would treat it consistently for tax purposes. Indeed, he noted that the tax ramifications of the transaction were not complicated and that there were no issues of constructive receipt, economic equivalence, deferred compensation, installment sales, or method of accounting. He explained that if the former consulting partners reported on their 2000 income tax returns that they received less than the full value of the shares they received in the transaction, Cap Gemini would have to report on its 2000 income tax returns that it received less value in the transaction as well, which would have decreased the amount of assets it could amortize and thus increased its tax liability. Or, if Cap Gemini reported on its income tax returns that it gave shares of its stock to the former consulting partners after the close of the transaction as deferred compensation, then the former consulting partners would have to treat the receipt of those shares as ordinary income rather than as a capital gain, resulting in an increased tax liability. To avoid these consequences, Cap Gemini reported the transaction on its income tax returns, pursuant to its understanding of the provisions of

the transaction documents, as an acquisition of assets in a completed sales transaction, and any subsequent forfeiture of stock as a reduction of its purchase price.[10] And, the consulting partners, according to Mr. Gordon's reading of the relevant documents, were to report their receipt of Cap Gemini stock on their income tax returns as a one-time capital gain. In fact, Mr. Gordon stated that between approximately 2006 and 2008, the Internal Revenue Service ("IRS") conducted an in-depth examination of Cap Gemini and its transaction with Ernst & Young and did not make any adjustments related to the transaction. Nevertheless, Mr. Hartman and other former consulting partners decided to challenge the transaction's tax consequences.[11]

### C. Mr. Hartman's Participation in the Transaction and the Resulting Tax Issues

Mr. Hartman became a partner in the consulting services division of Ernst & Young on April 16, 1990. At the time the transaction with Cap Gemini was proposed, he was the managing director of the products group, which was a group of 200 to 250 partners responsible for providing management consulting services for all of Ernst & Young's large manufacturing clients. He also served on the partner advisory council, which was a group of partners elected to advise the firm's management committee.

As a consulting partner, Mr. Hartman would be—and was—significantly affected by the proposed transaction between Ernst & Young and Cap Gemini. Accordingly, prior to the Atlanta meeting, Ernst & Young provided him with the Partner Information Document, which included a draft employment agreement, and gave him access to the Master Agreement, which included a draft employment agreement and the Global Shareholders Agreement. Mr. Hartman received and reviewed the Partner Information Document. However, he did not understand everything in it, such as the monetization restrictions. Although he was cautioned to consult his own legal, business, and tax advisors concerning the document's contents, he did not do so. Rather, he trusted that Ernst & Young would not agree to terms that would be to his disadvantage. Mr. Hartman did not review the Master Agreement or its exhibits prior to the Atlanta meeting, but he did review them, although not word for word, at a later date.

Mr. Hartman eventually received the Partner Transaction Agreement Kit. He skimmed through the headings in the Transaction Agreement, but did not discuss its terms with anyone at that time. He did not recall receiving, reviewing, or discussing the Global Shareholders Agreement, which was appended to the Master Agreement and referenced in the Transaction Agreement. Indeed, he indicated that he had no concerns about the Transaction Agreement.

Accordingly, on April 25, 2000, Mr. Hartman executed the revised Signature Document, thus becoming a party to the Master Agreement. At the time he executed this document, he did not obtain independent tax

---

**10.** Mr. Gordon explained that because one of the assets that Cap Gemini acquired in the transaction was goodwill related to the consulting partners who became its employees, any departure of those employees and resulting forfeiture of stock decreased the goodwill Cap Gemini acquired and thus effectively reduced the value Cap Gemini received in the transaction.

**11.** Mr. Gordon stated that he began to receive inquiries from former consulting partners regarding the possibility of amending their 2000 income tax returns about two years after the transaction. He advised those individuals that they could not amend their returns because they were forbidden from doing so by the agreement. Despite this warning, some former consulting partners filed amended 2000 federal income tax returns with the IRS. *See, e.g., United States v.*

*Fort,* No. 1:08–CV–3885–TWT, 2010 WL 2104671 (N.D.Ga. May 20, 2010), aff'd, 638 F.3d 1334 (11th Cir.2011); *United States v. Nackel,* 686 F.Supp.2d 1008 (C.D.Cal.2009); *United States v. Berry,* No. 06–CV–211–JD, 2008 WL 4526178 (D.N.H. Oct. 2, 2008); *United States v. Bergbauer,* No. RDB–05–2132, 2008 WL 3906784 (D.Md. Aug. 18, 2008), *aff'd,* 602 F.3d 569 (4th Cir. 2010); *United States v. Fletcher,* No. 06 C 6056, 2008 WL 162758 (N.D.Ill. Jan. 15, 2008), *aff'd,* 562 F.3d 839 (7th Cir.2009); *United States v. Culp,* No. 3:05–cv–0522, 2006 U.S. Dist. LEXIS 95030 (M.D.Tenn. Dec. 29, 2006). In each of the cited cases, the IRS refunded money to the former consulting partners based on their amended returns and then brought suit to recover the refunds. The United States prevailed in each case.

or legal advice. He explained again that he trusted Ernst & Young. In addition, after reviewing the documents "as much as [he] thought [he] needed to be comfortable," he determined that "it was a good business agreement...." Hartman Dep. 195:11–16.

Mr. Hartman was allocated 55,000 shares of Cap Gemini stock in the transaction. Upon the closing of the transaction, 13,750 of these shares were sold at a rate of 158.49 euros per share, and the proceeds of $2,179,187 were placed in Mr. Hartman's restricted account. The remaining 41,250 shares were also placed in Mr. Hartman's restricted account. Mr. Hartman "had no right to initiate or to make any investment decision with respect to" the contents of the restricted account. JS ¶ 18.

After the transaction closed, the former consulting partners began to receive information related to the payment of their 2000 income taxes. In one of the first of these documents, sent on December 5, 2000, the former consulting partners were advised that they could transfer a portion of the monetized funds in their restricted accounts to their unrestricted accounts, also held at Merrill Lynch,[12] to make estimated state income tax payments. They were also reminded that the monetized funds in their restricted accounts constituted "the total currently available from the transaction to fund the tax on the gain on [the] May 23, 2000 Cap Gemini transaction...." JE 778. Subsequently, on December 15, 2000, $894,490 of the monetized funds in Mr. Hartman's restricted account was transferred to his unrestricted account.

The following month, Mr. Hartman began to receive the forms he needed to complete his 2000 income tax returns. On January 31, 2001, Ernst & Young sent Mr. Hartman a Form 1099–INT. The form reflected that Mr. Hartman received $36,055.71 in interest income from Ernst & Young in 2000. Then,

on February 26, 2001, Cap Gemini sent Mr. Hartman several tax forms, including a Form 1099–B showing the amount of income that Mr. Hartman received in the Cap Gemini transaction. In a cover letter, Cap Gemini explained:

> In the Transaction Agreement you signed, you acknowledged your obligation to treat and report the Transaction for all relevant tax purposes in the manner provided in Sections 7.7(f) and (h) of the Master Agreement. The form 1099–B reflects the amount of consideration you are deemed to have received under Sections 7.7(f) and (h), including the valuation of your unsold Cap Gemini stock at $148.527 per share.[13]

*Id.* at 1203 (footnote added). The Form 1099–B reflected that Mr. Hartman received gross proceeds of $8,262,183 from the transaction in 2000. Mr. Hartman forwarded these documents to his tax advisor, as he did with all of the other tax information he received, but had no further discussions with his tax advisor about their contents.

Next, on March 15, 2001, the former consulting partners received two memoranda from Cap Gemini related to tax issues. In one memorandum, they were advised that the remaining monetized funds in their restricted accounts would be transferred to their unrestricted accounts on April 2, 2001, so that they could make their final 2000 income tax payments. In the other memorandum, they were advised on how to calculate their estimated income tax payments for 2001, given that their "2001 income [was] not likely to exceed" the income they received in 2000. *Id.* at 786.

Two weeks later, on March 28, 2001, Ernst & Young sent the former consulting partners a packet of 2000 income tax information. The packet included a memorandum in which Ernst & Young explained how the consulting partners were to report their gain from the

---

12. *The unrestricted accounts were opened at the same time as the restricted accounts. The unrestricted accounts were initially funded with the former consulting partners' "own funds coming out of the partnership that were free and clear," including the funds in their capital accounts, their earnings distributions, and any funds in their open accounts. Gordon I Dep. 138:11–15.*

13. The $148.527 valuation of the unsold shares—for Mr. Hartman, the 41,250 shares remaining in his restricted account—reflected "the 5% valuation discount agreed to with Cap Gemini in the Partner Transaction Agreement...." JE 1210.1.

transaction on their 2000 income tax returns. The packet also included the statement that the consulting partners were required to attach to their 2000 returns. The statement contained information required by Treasury Regulation § 1.751–1(a)(3) and set forth the consulting partners' gross proceeds from the transaction, the ordinary income resulting from the transaction, and the tax basis of the interests they sold to Cap Gemini. Mr. Hartman's statement reflected his receipt of $8,262,183 gross proceeds from the transaction and noted that, of that amount, $301,950 was reportable as ordinary income. It also indicated a zero basis for the interests he sold to Cap Gemini.

On April 2, 2001, as promised, $1,367,211 of monetized funds was transferred from Mr. Hartman's restricted account to his unrestricted account. An additional $391.88 was transferred the following day. When it came time to file their 2000 federal income tax return, the Hartmans, who use the cash receipts and disbursements method of accounting and who file their federal income tax returns jointly, sought an extension of the filing deadline. They included a payment of $2,190,000 with their extension request. They ultimately filed their return on August 8, 2001. On the return, which was "prepared in accordance with the letters and instructions" provided to Mr. Hartman by Cap

Gemini and Ernst & Young, the Hartmans reported a long-term capital gain of $7,960,-233—the $8,262,183 gross proceeds from the transaction minus the $301,950 of ordinary income. JS ¶ 22.

Unfortunately for the former consulting partners and other shareholders of Cap Gemini, the price of Cap Gemini stock, which had risen for a short period of time after the transaction had closed, "proceeded to free fall." Gordon I Dep. 142:23–24. Indeed, when some of Mr. Hartman's shares were monetized in 2001, their price had declined such that the Hartmans were required to report a long-term capital loss of $607,930 on Schedule D of their 2001 federal income tax return. The Hartmans' 2001 return also reflected dividends earned on the stock in Mr. Hartman's restricted account of $43,397.[14]

Ultimately, due to a downturn in business, Mr. Hartman decided to leave Cap Gemini.[15] He executed a Vice President Separation Agreement and Waiver on December 28, 2001. Pursuant to the terms of the agreement, Mr. Hartman was to remain an active employee of Cap Gemini through May 24, 2002, but would, after December 31, 2001, "have no right or obligation to perform any duties" for Cap Gemini. JE 1222. Along with a number of provisions related to sever-

---

14. It appears that the Hartmans also reported dividends earned on the stock in Mr. Hartman's restricted account on their 2002 federal income tax return. Although the record does not contain the corresponding year-end statement from Merrill Lynch, the court surmises, after comparing the Hartmans' 2001 and 2002 federal income tax returns and examining the Merrill Lynch statement from May 31, 2002, that they reported $30,733 in such dividends. *Compare* JE 3143 (2001 federal income tax return showing $43,397 in dividends from one of six "Merrill Lynch" accounts), *and id.* at 2698 (December 31, 2001 Merrill Lynch statement showing the receipt of $43,397.15 in dividends from Mr. Hartman's restricted account during 2001), *with id.* at 3276 (2002 federal income tax return showing $30,733 in dividends from one of seven "Merrill Lynch" accounts and that no other "Merrill Lynch" account had more than $5,610 in reported dividends), *and id.* at 1238 (May 31, 2002 Merrill Lynch statement showing the receipt of $7,369.02 in dividends from Mr. Hartman's restricted account on May 6, 2002).

15. Mr. Hartman stated that he approached his boss and proposed that because of the downturn

in business, he would leave Cap Gemini so long as an "amenable arrangement" could be reached. Hartman Dep. 96:16–19. He also stated that he was not terminated for cause, terminated for poor performance, subject to a reduction in force, or otherwise required to leave by Cap Gemini. Even though defendant does not contest Mr. Hartman's representation that he voluntarily left Cap Gemini, there is evidence suggesting that Mr. Hartman's departure from Cap Gemini was involuntary. The record contains a spreadsheet listing the former consulting partners who departed Cap Gemini between May 2000 and February 1, 2005, and forfeited shares of Cap Gemini stock. The former consulting partners are not identified by name, but on the fifth line of the spreadsheet, a former consulting partner who received an initial allocation of 55,-000 shares, had 21,086 shares available for forfeiture, and actually forfeited 10,543 shares underwent an "[i]nvoluntary" departure on May 24, 2002. JE 1227. Mr. Hartman officially left Cap Gemini on May 24, 2002, was initially allocated 55,000 shares, and likely forfeited 10,543 shares.

ance pay and benefits, Mr. Hartman agreed to the following terms addressing the forfeiture of his Cap Gemini stock:

(a) .... Remaining employed through May 24, 2002 results in my forfeiture of 38.4% (reduced from 56.7%) of my interest in the grant of shares held in the Restricted Account. Specifically, by remaining employed through May 24, 2002, I shall be permitted to retain an interest in an additional 10,082 of Cap Gemini S.A. shares that are contained in my Restricted Account.

(b) I understand that I shall be permitted further to retain an interest in 10,543 of the Cap Gemini S.A. shares that are contained in my Restricted Account that are otherwise subject to the 38.4% forfeiture set forth in subsection (a) above.

(c) I understand that my interest in the 20,625 shares of Cap Gemini S.A. stock referenced in subsections (a) and (b) above shall remain subject to all of the restrictions on sale or disposition set forth in the Transaction Agreement and the Restricted Account agreement with Merrill Lynch....

*Id.* In all, Mr. Hartman forfeited either 10,543 or 10,560 shares of Cap Gemini stock.

The Hartmans reported Mr. Hartman's forfeiture of Cap Gemini stock on their 2002 federal income tax return as a restoration of amounts held under a claim of right pursuant to section 1341 of the Internal Revenue Code. They included a statement with their return indicating that Mr. Hartman had returned 10,560 shares to Cap Gemini and that they had originally reported the receipt of these shares on their 2000 return. They claimed that because they overreported the number of shares Mr. Hartman received in 2000, they were entitled to a credit of $343,557. There is no indication in the record that the IRS disputed this credit.

Mr. Hartman did not begin to discuss the tax implications of the transaction—*i.e.*, the May 23, 2000 sale of Ernst & Young's consulting services business to Cap Gemini— with anyone until twelve to twenty-four months after he filed his 2000 federal income tax return, when he discussed them with his tax advisor. His tax advisor examined the transaction and concluded that because Mr. Hartman did not have control or take receipt of all of his Cap Gemini stock in 2000, he should not be taxed as if he had. Thus, on December 15, 2003, the Hartmans filed an amended 2000 federal income tax return. They reported that in 2000, Mr. Hartman received only twenty-five percent of the Cap Gemini stock allocated to him in the transaction, and therefore requested a refund of $1,298,134. The Hartmans also submitted contingent amended federal income tax returns for 2001 and 2002 that included changes consistent with their amended 2000 return and reflected the shares that Mr. Hartman purportedly received in those years pursuant to the monetization schedule.[16]

The IRS has not granted the Hartmans' refund request. Thus, the Hartmans filed suit in this court on June 21, 2005. The parties have now cross-moved for summary judgment. The court heard argument on the parties' motions on May 11, 2011.

## II. DISCUSSION

### A. Motions for Summary Judgment

Summary judgment is appropriate when there is no genuine issue of material fact and the moving party is entitled to a judgment as a matter of law. R. Ct. of Fed. Cl. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). A fact is material if it "might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202

---

**16.** The Hartmans did not change the amounts of taxable interest income and ordinary dividend income on their amended 2001 federal income tax return. On their original 2001 return, they reported receiving $33,732 in taxable interest and $75,905 in ordinary dividends, which included $9,729 in taxable interest and $43,397 in ordinary dividends attributable to Mr. Hartman's restricted account. They reported the same total amounts—$33,732 and $75,905—on their amended 2001 return even though they claimed that Mr. Hartman was not vested in all of the shares in his restricted account. Thus, it appears that the Hartmans were reporting interest and dividend income from shares in which they claimed that Mr. Hartman had not yet vested.

(1986). An issue is genuine if it "may reasonably be resolved in favor of either party." *Id.* at 250, 106 S.Ct. 2505.

The moving party bears the initial burden of demonstrating the absence of any genuine issue of material fact. *Celotex Corp.*, 477 U.S. at 323, 106 S.Ct. 2548. The moving party may discharge its burden by "pointing out . . . that there is an absence of evidence to support the nonmoving party's case." *Id.* at 325, 106 S.Ct. 2548. The moving party is not required to support its application with affidavits, but instead may rely solely on the pleadings, depositions, answers to interrogatories, and admissions. *Id.* at 324, 106 S.Ct. 2548. The nonmoving party then bears the burden of showing that there are genuine issues of material fact for trial. *Id.* The nonmoving party must go beyond the pleadings and support its opposition with affidavits or with depositions, answers to interrogatories, and admissions. *Id.*

The court must view the inferences to be drawn from the underlying facts in the light most favorable to the nonmoving party. *Matsushita Elec. Ind. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). Entry of summary judgment is mandated, "after adequate time for discovery," against a party who fails to establish "an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp.*, 477 U.S. at 322, 106 S.Ct. 2548.

### B. Tax Refund Claims

■ The Hartmans are seeking a refund of federal income taxes they paid for 2000.

The United States Court of Federal Claims ("Court of Federal Claims") possesses jurisdiction to entertain tax refund suits, 28 U.S.C. §§ 1346(a)(1), 1491(a)(1) (2000), so long as the taxpayer has paid the taxes at issue in full, *Shore v. United States*, 9 F.3d 1524, 1526 (Fed.Cir.1993), and filed a refund claim with the IRS that complies with the relevant laws and regulations, 26 U.S.C. § 7422(a) (2000). No jurisdictional impediments have been identified in this case.[17]

■ In tax refund suits, the court conducts a de novo review. *George E. Warren Corp. v. United States*, 141 F.Supp. 935, 940 (Ct.Cl.1956). The taxpayer bears the burden of proving that the amount of tax assessed and collected by the IRS is incorrect, *Helvering v. Taylor*, 293 U.S. 507, 515, 55 S.Ct. 287, 79 L.Ed. 623 (1935), and the amount he or she is entitled to recover, *United States v. Janis*, 428 U.S. 433, 440, 96 S.Ct. 3021, 49 L.Ed.2d 1046 (1976).

### C. Mr. Hartman's Receipt of Cap Gemini Stock

The overarching issue in this case is the proper treatment of Mr. Hartman's receipt of stock in the Cap Gemini transaction for federal income tax purposes. Other federal courts have addressed this issue, taking one of two general approaches. In one line of decisions, the courts treated the taxpayers as arguing that the form of the transaction that they agreed to in 2000 should have tax consequences different from those specified in the

---

17. The Hartmans have paid the taxes at issue. On their amended 2000 federal income tax return, they claimed an overpayment of taxes of $1,298,134, the same amount that they seek in their complaint. In addition, the parties submitted evidence suggesting that the Hartmans complied with the requirements for filing a refund claim with the IRS. For example, refund claims must be filed with the IRS within either three years of the filing of the tax return or within two years of the date of tax payment, whichever period ends later. 26 U.S.C. § 6511(a). The Hartmans filed their original 2000 return on August 8, 2001, and their amended 2000 return on December 15, 2003, well within the three-year time limit.

Additionally, the evidence suggests that the Hartmans have complied with the requirements for filing suit in this court. Refund suits in the Court of Federal Claims may not be filed until six months after the filing of a refund claim unless the refund claim is denied within that period, 26 U.S.C. § 6532(a)(1); must be filed within two years of the earlier of the mailing of the notice of disallowance of the claim or the filing of a waiver of notice of disallowance, *id.* § 6532(a)(1), (3); and, in the absence of a disallowance notice or waiver, must be filed within the Tucker Act's six-year statute of limitations, which would begin to run six months after the refund claim was filed, 28 U.S.C. § 2401; *Bowman Transp., Inc. v. United States*, 597 F.2d 254, 257 (Ct.Cl.1979). More than six months have passed since the Hartmans filed their amended 2000 return on December 15, 2003, the IRS has not acted on their refund claim, and there is no evidence that they have waived notice of disallowance. Thus, their suit, filed on June 21, 2005, appears to be timely filed.

relevant transaction documents. Those courts thus examined both whether and when the taxpayers actually or constructively received the stock. *See Fort,* 638 F.3d at 1338–42; *Fletcher,* 562 F.3d at 842–45; *Fort,* 2010 WL 2104671, at *1–2; *Nackel,* 686 F.Supp.2d at 1020–23. In the other line of decisions, the courts treated the taxpayers as attempting to recharacterize the transaction that they agreed to in 2000 to obtain more favorable taxation. To determine whether the taxpayers were entitled to recharacterize the transaction, those courts applied the prevailing rule in their circuit, whether it be the *Danielson* rule, the strong proof test, the economic reality test, or a balancing approach. *See Bergbauer,* 602 F.3d at 577–80; *Berry,* 2008 WL 4526178, at *3–7; *Bergbauer,* 2008 WL 3906784, at *6–10; *Fletcher,* 2008 WL 162758, at *8–13; *Culp,* 2006 U.S. Dist. LEXIS 95030, at *61–64.

This division in the case law is reflected in the arguments advanced by the parties in the instant case. The Hartmans argue that there is no real dispute concerning the form of the transaction. Instead, they contend that given the structure of the transaction described in the relevant transaction documents, Mr. Hartman did not actually or constructively receive all of his shares of Cap Gemini stock in 2000. Therefore, they assert, they should not be taxed in 2000 on all of the shares allocated to Mr. Hartman in the transaction. Defendant, on the other hand, argues that the Hartmans are attempting to recharacterize the terms of the transaction to obtain preferred taxation. It contends that under the *Danielson* rule, the Hartmans are prohibited from recharacterizing the transaction and that they should be taxed in 2000 on all of the Cap Gemini stock Mr. Hartman received in the transaction. The court begins its analysis with an examination of the *Danielson* rule.

### 1. The *Danielson* Rule

The *Danielson* rule was articulated by the en banc United States Court of Appeals for the Third Circuit ("Third Circuit") in *Commissioner v. Danielson.* The taxpayers in *Danielson* were shareholders in a loan business who decided to sell their stock in the business to another company. 378 F.2d 771, 772–73 (3d Cir.1967) (en banc). In exchange for their stock and their agreement not to compete with the purchasing company for approximately six years, they received $374 per share. *Id.* at 773. For tax purposes, the parties expressly allocated the purchase price between the covenant not to compete and the stock: $152 was allocated for the former and $222 was allocated for the latter. *Id.* On their federal income tax returns, the taxpayers reported the entire amount received in the transaction as proceeds from the sale of capital assets. *Id.* The IRS, however, found that the amount allocated to the covenant not to compete should be treated as ordinary income and issued notices of deficiency. *Id.* at 773–74. The taxpayers appealed this determination to the United States Tax Court, which ruled in their favor. *Id.* at 774. On appeal to the Third Circuit, the IRS argued:

> [W]here the parties to a transaction involving the sale of a business have entered into a written agreement spelling out the precise amount to be paid for a covenant not to compete, they should not then be permitted, for tax purposes, to attack such provision except in cases of fraud, duress or undue influence.

*Id.* The Third Circuit agreed with the IRS, noting:

> [T]o permit a party to an agreement fixing an explicit amount for the covenant not to compete to attack that provision for tax purposes, absent proof of the type which would negate it in an action between the parties, would be in effect to grant, at the instance of a party, a unilateral reformation of the contract with a resulting unjust enrichment.

*Id.* at 775. It therefore adopted the following rule, subsequently known as the *Danielson* rule: "a party can challenge the tax consequences of his agreement as construed by the Commissioner only by adducing proof which in an action between the parties to the agreement would be admissible to alter that construction or to show its unenforceability because of mistake, undue influence, fraud, duress, etc." *Id.*

The United States Court of Claims ("Court of Claims") and its successor, the United

States Court of Appeals for the Federal Circuit ("Federal Circuit"), have cited *Danielson* with approval. For example, in *Dakan v. United States,* the court concluded that the *Danielson* rule applied where a taxpayer had agreed to a particular allocation of the purchase price of his business among three contract rights and four capital assets, but then, on his federal income tax returns, reported the entire purchase price as a gain from the sale of a capital asset. 492 F.2d 1192, 1196–99 (Ct.Cl.1974) (per curiam). In *Stokely–Van Camp, Inc. v. United States,* the Federal Circuit held that the *Danielson* rule applied where a taxpayer argued that the premium it paid for the purchase of stock was allocated to a standstill covenant even though the agreement contained no express allocation to the covenant. 974 F.2d 1319, 1352–26 (Fed.Cir.1992). And, in *Lane Bryant, Inc. v. United States,* the Federal Circuit concluded that the *Danielson* rule applied where a taxpayer argued that the premium it paid for the purchase of stock was allocated to nonstock items even though the agreement contained no express allocation to the nonstock items. 35 F.3d 1570, 1574–76 (Fed.Cir.1994).

Given this precedent, there is no question that the *Danielson* rule is binding on this court. However, the Federal Circuit has only applied the rule when a taxpayer challenges "express allocations of monetary consideration. . . ." *Id.* at 1575; *accord id.* at 1576 ("[T]he *Danielson* rule requires that we take the allocation made by the parties at face value for tax purposes. . . ."); *Stokely–Van Camp, Inc.,* 974 F.2d at 1325 (noting that the Court of Claims had adopted the *Danielson* rule, which provided that "a taxpayer may not disregard the terms of a contract allocating the payment thereunder and adopt a different allocation having more favorable tax consequences"). Indeed, defendant has not cited any instance in which the Court of Claims or the Federal Circuit have adopted the *Danielson* rule in circumstances where, like here, there was no dispute concerning the allocation of a purchase price.

Instead, likely because the rule set forth in *Danielson* is framed in general terms, defendant suggests that it can be applied beyond

the factual circumstances of *Danielson, Dakan, Stokely–Van Camp, Inc.,* and *Lane Bryant, Inc.*—where the taxpayers were challenging express allocations of a purchase price—to any taxpayer challenge of the tax consequences of a sales agreement. But even if such a broad application of the *Danielson* rule is permitted, it would still have no application here. In *Danielson* and the case law of this circuit, the taxpayers were attempting to alter the express terms of their agreements to obtain preferable tax treatment. The Hartmans are not making such an attack. Rather, they contend that the tax consequences of the transaction Mr. Hartman participated in are different from the ones set forth in the relevant transaction documents. They are not challenging the form of the transaction, only the tax consequences that flow from that form.

■ The Hartmans are correct that, as a general proposition, an agreement by contracting parties adopting a particular scheme of taxation cannot take precedence over the Internal Revenue Code's treatment of the transaction. *See First Trust Co. of Omaha v. United States,* 1 F.Supp. 900, 904 (Ct.Cl. 1932) ("Agreements entered into between individuals may not prevail as against the provisions of the revenue laws if in conflict therewith."); *see also Connolly v. Pension Benefit Guar. Corp.,* 475 U.S. 211, 224, 106 S.Ct. 1018, 89 L.Ed.2d 166 (1986) ("If the regulatory statute is otherwise within the powers of Congress, . . . its application may not be defeated by private contractual provisions."); *Norman v. Balt. & Ohio R.R. Co.,* 294 U.S. 240, 307–08, 55 S.Ct. 407, 79 L.Ed. 885 (1935) ("Contracts, however express, cannot fetter the constitutional authority of Congress. Contracts may create rights of property, but, when contracts deal with a subject-matter which lies within the control of the Congress, they have a congenital infirmity. Parties cannot remove their transactions from the reach of dominant constitutional power by making contracts about them."). In this case, the contracting parties, including Mr. Hartman, agreed to contractual provisions that purported to describe the tax consequences of the Cap Gemini transaction. If those provisions conflict with how the Internal Revenue Code would treat

the transaction, then the parties' agreement with respect to the transaction's taxation would be invalid. Accordingly, the court's analysis must proceed in two stages. First, what was the form of the transaction agreed to by the parties? And, second, how do the Internal Revenue Code and Treasury Regulations treat such a transaction?

## 2. The Parties' Agreement Regarding the Form of the Transaction

The court must first ascertain the form of the transaction agreed to by the parties. To do so, it examines the three main transaction documents: the Master Agreement, the Transaction Agreement, and the Global Shareholders Agreement. The Master Agreement provided that, as part of the transaction, Cap Gemini would "deliver" to each consulting partner a specified number of shares of Cap Gemini stock. JE 43. It indicated that the consulting partners, and not Cap Gemini, would be considered the legal or beneficial owners of the stock at the close of the transaction and that the stock would carry dividend rights. Similarly, the Transaction Agreement provided that the consulting partners would receive a specified number of shares that Cap Gemini would "issu[e]" to them for their "own account as principal," *id.* at 623, and then "deposit[ ]" into their restricted accounts, *id.* at 620. In addition, both the Transaction Agreement and the Global Shareholders Agreement referred to the consulting partners as the beneficial owners of the Cap Gemini stock and indicated that the shares would have voting rights attached to them.

The aforementioned provisions in these three documents suggest that Mr. Hartman received all of his Cap Gemini stock when the transaction closed in 2000. However, these documents also made it clear that the Cap Gemini stock deposited in the consulting partners' restricted accounts was subject to a number of limitations. The Transaction Agreement and the Global Shareholders Agreement more particularly described the limitations, providing that within the first four years and three-hundred days after the transaction closed, the consulting partners were limited in the number of shares of stock

they could monetize, were restricted in when they could monetize those shares, and could forfeit some or all of their shares if they left Cap Gemini. These limitations suggest the possibility that Mr. Hartman did not receive all of his Cap Gemini stock when the transaction closed in 2000.

Notwithstanding the apparent tension between the provisions suggesting a one-time receipt of Cap Gemini stock by the consulting partners and the provisions suggesting that the consulting partners would receive their Cap Gemini stock over a period of time, the Master Agreement's provisions concerning the tax treatment of the transaction strongly implicate a onetime taxable event. In particular, the Master Agreement provided that, for federal tax purposes, all of the parties to the transaction, including the consulting partners, would treat the transaction as a sale of Ernst & Young's consulting services business to Cap Gemini in exchange for Cap Gemini stock and cash, that Cap Gemini would provide each consulting partner with a Form 1099–B for the transaction, and that the consulting partners would file a required statement with their 2000 federal income tax returns. The precise nature of the parties' agreement with respect to the transaction's tax treatment, however, is ultimately irrelevant, as it is the Internal Revenue Code and Treasury Regulations that dictate how the transaction is taxed. Thus, the court turns to the second stage of its analysis—the tax treatment of the transaction under federal law.

## 3. Tax Consequences of the Transaction

Taxable income is an individual's gross income minus any allowable deductions. 26 U.S.C. § 63(a). Gross income is "all income from whatever source derived," including "[c]ompensation for services," "[g]ross income derived from business," and "[g]ains derived from dealings in property[.]" *Id.* § 61(a). For taxpayers like the Hartmans, who use the cash receipts and disbursements method of accounting, "[t]he amount of any item of gross income shall be included in the gross income for the taxable year" in which they received it. *Id.* § 451(a). Receipt by the taxpayer encompasses both actual receipt and constructive receipt. Treas.

Reg. § 1.451–1(a) (2000). Income is actually received if it is "actually reduced to a taxpayer's possession...." *Id.* § 1.451–2(a). Income is constructively received if it is "credited to [a taxpayer's] account, set apart for him, or otherwise made available so that he may draw upon it at any time, or so that he could have drawn upon it during the taxable year if notice of intention to withdraw had been given." *Id.* "However, income is not constructively received if the taxpayer's control of its receipt is subject to substantial limitations or restrictions." *Id.*

"The concept of constructive receipt is designed to prevent taxpayers who can control the timing of the receipt of income from shifting the year of receipt so as to avoid or reduce the tax to which they would normally be subject." *Patton v. United States,* 726 F.2d 1574, 1577 (Fed.Cir.1984). In addition, taxpayers constructively receive income if they possess the authority to direct its disposition. *Fletcher,* 562 F.3d at 843. Control of the income, whether it be control of its receipt or control of its disposition, is the key factor. *Fort,* 2010 WL 2104671, at *1; *Nackel,* 686 F.Supp.2d at 1020; *see also Fort,* 2011 WL 1466419, at *4 ("[T]he more control a taxpayer has over the receipt of income, the more likely the taxpayer has constructively received the income.").

The issue in this case is whether Mr. Hartman constructively received, in 2000, the seventy-five percent of the shares of Cap Gemini stock that were not liquidated to pay his state and federal income taxes. Two federal appellate courts have already addressed this issue in suits brought by other former consulting partners. In *Fletcher,* the United States Court of Appeals for the Seventh Circuit ("Seventh Circuit") analogized the former consulting partner appellant to an investor selling a patent. 562 F.3d at 843. In its example, the inventor sold a patent for $2.5 million to be paid immediately, but instead of taking the entire payment in cash up front, contractually agreed that $2 million of the proceeds would be placed in a trust and not distributed until five years later. *Id.* The court explained that an "[a]greement with the buyer that $2 million would be sent to a trustee and held for five years [would] not

avoid the fact that the inventor had the power to direct what became of the money; that's what the contract was about." *Id.* In other words, "a taxpayer's willingness to defer consumption does not defer taxation—for the tax falls on income rather than consumption." *Id.* The situation of a consulting partner participating in the Cap Gemini transaction, the court opined, was similar to its inventor example: the consulting partner "agreed by contract that 75% of the consideration would be held in a restricted account for up to five years" and "her willingness to accept restrictions and defer consumption [did] not eliminate constructive receipt in 2000." *Id.* The court considered three factors to be important to its decision: the partners "stood to receive the entire market gain, and to bear all loss, from the moment the transaction closed in 2000"; the partners "agreed to postpone [their] unrestricted access to the stock"; and the partners "agreed to the amount of the discount." *Id.* at 844.

The Seventh Circuit then addressed whether the forfeiture provisions altered the outcome. It first found that because any gain or loss of value of the Cap Gemini stock belonged to the partners as soon as the transaction closed, the transaction, even with the forfeiture provisions, looked "more like income in 2000 than like a stream of payments over time." *Id.* It then noted that this conclusion was in accord with the principle, articulated by other courts, that "where stock is transferred under a sales agreement and held in escrow to guarantee a party's performance under the agreement, the party 'receives' the stock when it is placed in escrow rather than when it is released." *Id.* (citing *Chaplin v. Comm'r,* 136 F.2d 298, 299–302 (9th Cir.1943); *Bonham v. Comm'r,* 89 F.2d 725, 726–28 (8th Cir.1937)). Finally, it posited that "[t]he more likely it is that the [forfeiture] conditions will be satisfied, and all restrictions lifted, the more sensible it is to treat all of the stock as constructively received when deposited in the [restricted] account." *Id.* Because "[t]he sort of contingencies that could lead to forfeitures were within the ex-partners' control," the court concluded that all of the stock received by the former consulting partners was constructively received in 2000. *Id.* at 845.

The other appellate court ruling on the issue, the United States Court of Appeals for the Eleventh Circuit ("Eleventh Circuit"), also used the escrow analogy: "The doctrine of constructive receipt is implicated when a taxpayer receives an asset, but that asset is placed in an escrow account, only to be released to the taxpayer upon the occurrence of some contingency." *Fort*, 638 F.3d at 1339. The court recognized, however, that "a taxpayer presently realizes income" only "when he or she possesses sufficient indicia of control over the assets held within [the] escrow account or escrow-type arrangement." *Id.* (discussing *Chaplin*, 136 F.2d at 298; *Bonham*, 89 F.2d at 725). The court identified three factors constituting evidence that the partners who received Cap Gemini stock in the transaction constructively received all of the stock in 2000: the shares were deposited into accounts in the partners' names and held in the accounts for the partners' benefit; the partners had dividend and voting rights related to the shares; and, because the restrictions on a former consulting partner's shares did not fully expire until he or she had been employed at Cap Gemini for four years and three-hundred days, the shares served as a guarantee of performance. *Id.* at 1340.

Addressing the forfeiture conditions, the Eleventh Circuit held that the former consulting partners "had sufficient control over whether [their] shares would be forfeited." *Id.* at 1341. It explained that a forfeiture of shares might occur only if a former consulting partner was terminated for cause or for poor performance; shares were not forfeited if the termination was for any other reason or was outside the former consulting partner's control, such as with a reduction in force. *Id.* The court concluded, moreover, that even if a poor performance termination might "require some subjective judgment" by Cap Gemini, "the mere potential for subjective judgment does not foreclose constructive receipt." *Id.* at 1342. In sum, the court held that the former consulting partner appellant realized income with respect to all of the Cap Gemini stock allocated to him when the Cap Gemini stock was deposited into his restricted account in 2000. *Id.*

■ This court sees no reason to depart from the well-reasoned analyses and conclusions of the Seventh and Eleventh Circuits. Mr. Hartman, like the former consulting partners in *Fletcher* and *Fort*, had a significant amount of control over his receipt and disposition of Cap Gemini stock. First, prior to executing the transaction documents, Mr. Hartman had ample opportunity to review their provisions and seek outside legal and financial advice regarding their implications. In fact, he was a sophisticated and knowledgeable individual with the resources to evaluate the terms and consequences the transaction.[18] Thus, he was fully aware of the bargain to which he was agreeing; the transaction was not foisted upon him.[19]

18. Other courts considering challenges to the Cap Gemini transaction's taxation also commented on the sophistication of the former consulting partners. *See Fletcher*, 562 F.3d at 842 ("Even naïve people baffled by the fine print in contracts are held to their terms; a sophisticated business consultant who agrees to a multi-million-dollar transaction is not entitled to demand the deal's benefits while avoiding its detriments."); *Nackel*, 686 F.Supp.2d at 1025 (quoting as persuasive the Seventh Circuit's characterization of the former consulting partners as "sophisticated business consultant[s]"); *Bergbauer*, 2008 WL 3906784, at *10 n. 6 ("[M]uch like the taxpayers in *Culp* and *Fletcher*, Robert Bergbauer was an accomplished professional at the time of the transaction and 'not an unsophisticated school[boy].'"); *Fletcher*, 2008 WL 162758, at *11 ("There is no dispute that, at the time of the transaction, Cynthia [Fletcher] was a partner of Ernst & Young, not an unsophisticated schoolgirl." (citation omitted)); *Culp*, 2006

U.S. Dist. LEXIS 95030, at *63 ("Cathy Culp made no 'mistake' when she assented to the terms of the Cap Gemini—Ernst & Young Transaction. When the Transaction closed, she was an accomplished businesswoman experienced with contracts."); *see also Culp*, 2006 U.S. Dist. LEXIS 95030, at *56 n. 13 (noting that the handwritten notes that Ms. Culp made on the Partner Information document were "evidence that even before voting in favor of the Transaction, [she] read and understood the 2000 tax implications of the Transaction as applied to her as an accredited partner").

19. Other courts considering challenges to the Cap Gemini transaction's taxation also addressed the former consulting partners' bargaining power and their understanding of the transaction. *See Bergbauer*, 602 F.3d at 579 ("All parties to the transaction, bargaining at arms-length, had economic reasons to subject the entirety of the consulting partners' Cap Gemini stock to full and

Accordingly, by executing the transaction documents, Mr. Hartman expressly agreed to accept a specified number of shares of Cap Gemini stock as consideration for the sale of his partnership interests in Ernst & Young's consulting services business. He further agreed that Cap Gemini would deposit his shares into an account in his name and for his benefit. Moreover, Mr. Hartman agreed that the shares would have dividend rights and voting rights attached to them. Indeed, Mr. Hartman actually received dividends and he exercised his voting rights by assenting to the appointment of an attorney-in-fact to vote his shares on his behalf. Finally, once the shares were deposited into his account, Mr. Hartman was the sole beneficiary of any increase in share value and bore the complete burden of any decline in value.

The control that Mr. Hartman exercised over his Cap Gemini stock in 2000 was not defeated by the monetization restrictions and forfeiture conditions described in the transaction documents. Importantly, Mr. Hartman voluntarily agreed to accept his share of the transaction proceeds with these limita-tions.[20] In other words, Mr. Hartman, due to receive proceeds from the sale of a business, agreed, by contract, to dispose of that income into an account that carried certain restrictions.[21] Further, with respect to the forfeiture conditions, Mr. Hartman had significant control as to whether they would be exercised. His job performance would bear heavily on whether he was terminated for cause or terminated for poor performance and his actions would determine whether he breached the employment contract or voluntarily terminated his employment. In fact, it was Mr. Hartman, and not Cap Gemini, who chose to terminate his employment. There is no evidence in the record that Mr. Hartman performed his job poorly or had taken any action that would cause Cap Gemini to terminate his employment. In sum, Mr. Hartman's control over his Cap Gemini stock, even in light of the monetization restrictions and the forfeiture conditions, was not subject to substantial limitations or restrictions that would prevent the constructive receipt of the stock in 2000.

immediate taxation in 2000."), 580 ("[T]he parties bargained for mutually beneficial tax consequences...."); *Nackel*, 686 F.Supp.2d at 1024 ("Far from suggesting that the contract was foisted on the consulting partners, the need for such a sizeable portion of them to agree to the deal demonstrates that they were an integral party to the deal."), 1026 ("[John] Nackel like the consulting partners in the other cases, knew what he was voting on, he assented to the transaction by voting for it, and his claims of being coerced into the deal fall flat."); *Berry*, 2008 WL 4526178, at *4 ("The undisputed facts belie [Nancy Berry's] claim that she was a third party with no bargaining power. Several partners from Berry's consulting practice group directly participated in the stock transaction negotiations on behalf of all of the [consulting partners], including Berry. All [consulting partners] were invited to participate in the two-day meeting held in March 2000 to discuss the proposed transaction. After the meeting, each [consulting partner] was given a paper ballot on which he or she could privately vote for or against the transaction.... The involvement of the negotiating partners, Berry's opportunity to participate in the March 2000 meeting, and her ability to vote all show that Berry was a party to the transaction with bargaining power."); *Bergbauer*, 2008 WL 3906784, at *9 ("[E]ven if [Mr.] Bergbauer did not immediately appreciate the operative tax language contained within the [Partner Information Document], after attending the March 7–8, 2000 meeting he was well aware that all parties to the agreement intended for the Consulting Partners to be immediately taxed on the entirety of their received Cap Gemini shares."), *10 ("[A]ll parties were engaged in arms-length negotiations in which each party bargained for and received real economic benefit.... [F]ull and immediate taxation was consciously chosen by sophisticated parties for real economic purposes."); *Culp*, 2006 U.S. Dist. LEXIS 95030, at *61 ("[Ms.] Culp agreed to the contractual terms of the Cap Gemini—Ernst & Young Transaction, and received exactly what she agreed to receive.").

20. Mr. Hartman stated that he did not know the purpose of the monetization restrictions, but the undisputed evidence in the record indicates that the restrictions were to Mr. Hartman's benefit because by preventing the partners from selling their stock en masse, the value of all of the partners' Cap Gemini stock was protected. *See also Bergbauer*, 602 F.3d at 579 (quoting a portion of a deposition of Mr. Gordon, not submitted as evidence in this case, to that effect).

21. In fact, there is evidence in the record that the consulting partners' assent to the monetization restrictions was based, in part, on their receipt of the five percent discounted valuation for the shares they could not sell in 2000. The consulting partners obtained the discount via negotiations with Cap Gemini, suggesting that they had a certain amount of control over the terms of the monetization restrictions to which they ultimately agreed.

The escrow decisions cited by the Seventh and Eleventh Circuits lend further support to the court's conclusion.[22] In *Chaplin*, stock in a motion picture company was issued to the taxpayer, an actor-producer, and immediately placed into an escrow account for the taxpayer's benefit with the agreement that the escrow agent would release a certain number of shares of the stock to the taxpayer for each motion picture he delivered. 136 F.2d at 301. The records of the motion picture company reflected that the stock had been issued in the name of the taxpayer. *Id.* at 300. In addition, the taxpayer exercised his voting rights and dividends declared on the stock were paid to the escrow agent. *Id.* Based on these facts, the court concluded that "[a]ll the significant corporate acts respecting the shares," including those related to the taxpayer's voting and dividend rights, were "consistent with their issue" to the taxpayer. *Id.* at 301–02. Accordingly, the court held, contrary to the government's position, that the taxpayer owned the stock for tax purposes when it was first issued to him and not when it was released from the escrow account. *Id.*

In *Bonham*, the taxpayer received, pursuant to the terms of a contract, shares of stock in a bank. 89 F.2d at 726. As part of the agreement, the bank retained some of the shares owed to the taxpayer to guarantee contract performance. *Id.* at 727. Upon the contract's performance, the bank released the retained shares to the taxpayer. *Id.* The taxpayer contended that he should not be taxed on the retained shares until the bank released them to him. *Id.* The court disagreed. Noting that the contract between the taxpayer and the bank provided that the taxpayer would "deposit" the shares with the bank as "a guarantee" of contract performance and that the bank would retain the shares "until all the requirements" of the contract were "fulfilled," the court concluded that "[t]he stock was issued, the title passed then to [the taxpayer], and the stock was retained as a pledge." *Id.* Accordingly, held the court, the stock was properly included in income at the time the contract was executed. *Id.* at 728.

The form of the transactions in *Chaplin* and *Bonham* is similar to the form of the transaction in this case.[23] Mr. Hartman agreed to accept shares of Cap Gemini stock, in his name and for his benefit, as consider-

---

**22.** Although the Seventh and Eleventh Circuits only cite and discuss decisions from the United States Courts of Appeals for the Eighth and Ninth Circuits, other federal appellate courts have applied the same principle regarding the taxation of funds placed into escrow. For example, in *Harris v. Commissioner*, the United States Court of Appeals for the Fourth Circuit stated:

> Sale proceeds, or other income, are constructively received when available without restriction at the taxpayer's command; the fact that the taxpayer has arranged to have the sale proceeds paid to a third party and that the third party is, with [the] taxpayer's agreement, not legally obligated to pay them to taxpayer until a later date, is immaterial.

477 F.2d 812, 817 (4th Cir.1973).

**23.** At oral argument, plaintiff asserted that the decision of the Court of Claims in *Denver & Rio Grande Western Railroad Co. v. United States*, 505 F.2d 1266 (Ct.Cl.1974), undercut the applicability of *Chaplin* and *Bonham* to this case. The court disagrees. As another court later summarized:

> In *Denver & Rio Grande Western Railroad*, the IRS disallowed inclusion of the cost of building a spur line in the cost basis for depreciation. The cost was paid by a customer and

the taxpayer had agreed to repay the customer in semi-annual installments for a period not to exceed 10 years, at the rate of 32 percent of the revenues earned by the taxpayer from using the spur line after 100,000 tons of potash had been transported on the line each year. The Court of Claims upheld the disallowance of the depreciation on the spur line because the obligation to repay the advance was not fixed and definite: "Absent a binding obligation on the Railroad's part to repay all of [the customer's] advances at the time the investment credit and depreciation deductions were taken we deem it impossible to value the obligation assumed."

*Transam. Corp. v. United States*, 999 F.2d 1362, 1368 (9th Cir.1993) (citations omitted). In other words, the taxpayer railroad in *Denver & Rio Grande Western Railroad Co.* received an advance or loan that it expected to repay, whether in part or in full, within a ten year period. *See also Gibson Prods. Co. v. United States*, 460 F.Supp. 1109, 1115 (N.D.Tex.1978) (noting that cases such as *Denver & Rio Grande Western Railroad Co.* "hold that an obligation, which is too contingent and speculative, should not be included in cost basis"), *aff'd*, 637 F.2d 1041 (5th Cir. Unit A Feb.1981). Mr. Hartman, in contrast, received a payment for his partnership interests in Ernst & Young that he expected to retain after five years. The cases are thus factually distinct.

ation for the sale of his partnership interests in Ernst & Young, and further agreed that some of those shares would be held in a restricted account, for a specified period of time, as a guarantee of his continued employment with Cap Gemini. And, while the shares were held in the restricted account, Mr. Hartman could vote them and receive dividends from them. Thus, Mr. Hartman received all of the shares, for tax purposes, in 2000, when they were issued to him by Cap Gemini.

### III. CONCLUSION

In the absence of any genuine issues of material fact, the court concludes that summary disposition is warranted. Mr. Hartman constructively received 55,000 shares of Cap Gemini stock in 2000 and the Hartmans properly reported the gain from Mr. Hartman's receipt of that stock on their 2000 federal income tax return. Therefore, the Hartmans are not entitled to a refund. Accordingly, the court **GRANTS** defendant's motion for summary judgment and **DENIES** plaintiffs' motion for summary judgment. Plaintiffs' complaint is **DISMISSED WITH PREJUDICE.** No costs. The clerk shall enter judgment accordingly.

**IT IS SO ORDERED.**